## In re SEITZ

Docket No. 90794. Argued September 3, 1992 (Calendar No. 1). Decided February 2, 1993. Dissenting opinion by LEVIN, J., filed February 3, 1993. Rehearing denied 442 Mich 1247.

The Judicial Tenure Commission recommended to the Supreme Court that James McCauley Seitz be removed as judge of the Monroe County Probate Court, after finding that he engaged in misconduct, spanning a two and one-half year period, in violation of the standards of judicial conduct set forth in MCR 9.205 and the Code of Judicial Conduct. William R. Peterson, retired judge of the Wexford Circuit Court, was appointed as master. Following a hearing, the master found that Judge Seitz engaged in acts demonstrating a pattern of gross judicial misconduct, namely, the installation of a telephone listening device, abuse of the contempt power, an unprofessional relationship with and hostile attitude towards employees, wilful neglect of his adoption docket and refusal to respond to requests by the State Court Administrator's Office, and the failure to file reports with the SCAO. The commission adopted in full the master's findings of fact and conclusions of law, concluded that Judge Seitz was guilty of judicial misconduct, and recommended that he be removed from office and be barred from ever holding judicial office.

In an opinion by Justice BRICKLEY, joined by Chief Justice CAVANAGH, and Justices BOYLE, RILEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

Judge James McCauley Seitz is removed from judicial office.

Both by his actions and his expressed declarations as he went about the exercise of his duties, Judge Seitz has demonstrated an attitude and a mind-set that convinces the Supreme Court that he is woefully unfit for judicial office. He not only exhibited a lack of the qualities from which judicial temperament springs, but he has exhibited a distinct pattern of injudicious temperament and conduct. Beyond doubt, he was habitually intemperate within the meaning of Const 1963, art 6, § 30, and Canons 2A, 3A(3) and 3B of the Code of Judicial Conduct, all of which constitutes misconduct in office under MCR 9.205(C)(3) and (4). His behavior was sufficiently serious and pervasive that

his continuation in judicial office would be clearly prejudicial to the administration of justice.

Justice LEVIN, concurring in part and dissenting in part, stated that the discipline recommended and imposed is so disproportionate to Judge Seitz' conduct that, absent a finding that he committed or aided and abetted the commission of a felony, the cause should be remanded to the Judicial Tenure Commission for a recommendation of discipline on the assumption that Judge Seitz did not commit a felony.

The constitution provides that the Supreme Court is empowered to impose discipline on the recommendation of the Judicial Tenure Commission. Generally, in Michigan, judges have been removed from office only for criminal conduct. In past cases, the Court has declined to impose discipline greater than that recommended by the commission even where a majority was of the opinion that greater discipline should be imposed. In this case, it is manifest from past recommendations of the commission that Judge Seitz could not, consistent with past recommendations, be removed from office for the offenses it found he committed, other than the finding that he committed a felony, a finding that the majority correctly declines to adopt.

This should not be understood to contend that the commission is bound by the precedents of the levels of discipline recommended and imposed in the past. There is no evidence that the commission has decided to increase the level of discipline generally. The recommendations of the commission in this case are not evidence that it has raised the level of its recommendation generally, because one of the findings of misconduct is the finding that Judge Seitz committed a felony, a finding that the majority does not adopt.

*Joseph F. Regnier* and *Catherine L. McGuigan* for the Judicial Tenure Commission of the State of Michigan.

*Murphy, Brenton & Spagnuolo, P.C.* (by *Frederick J. Griffith*), for the respondent.

BRICKLEY, J.

### INTRODUCTION

On April 12, 1991, this Court appointed retired Circuit Judge William R. Peterson as master to preside over the hearing of Formal Complaint No. 43, filed by the Judicial Tenure Commission

against Honorable James McCauley Seitz, Monroe County Probate Court, Monroe, Michigan.[1]

The twenty-five paragraph complaint centered on the following general acts of alleged misconduct:[2]

1. Wilful neglect of adoption docket and refusal to respond to requests by the State Court Administrator's Office (SCAO);

2. Abuse of contempt power;

3. Improper delegation of authority to release juveniles from youth home facility;

4. Order that certain youth home personnel be barred from his courtroom or from working on any cases assigned to him;

5. Improper order that predispositional assessments and psychological evaluations be conducted by outside psychologists;

6. Unprofessional relationship with and hostile attitude toward employees;

7. Installation of a telephone listening device;

8. Encouraging employees to commit perjury;

9. Improper handling of and disqualification from a particular adoption case—*In re Brown;*

10. Failure to file reports with the SCAO.

These events spanned two and one-half years, from August 3, 1988, through January 8, 1991. The commission charged that the alleged acts

[1] The Judicial Tenure Commission issued the complaint on March 20, 1991. An answer was filed on April 1, 1991. This Court had previously relieved Judge Seitz of his judicial and administrative duties on January 31, 1991, and then suspended him with pay on April 23, 1991, pursuant to a supplemental petition for interim suspension filed by the commission.

[2] An amended complaint was ordered by the master at the prehearing conference. It was filed on May 8, 1991.

constituted violations of the standards of judicial conduct under MCR 9.205 and the Code of Judicial Conduct.

Beginning on October 7, 1991, the master heard testimony for nine days. Although he found that the commission failed to prove all the allegations of the twenty-five-paragraph complaint[3]—some were not found to be proven by a preponderance of the evidence and others not to amount to judicial misconduct—he did conclude that Judge Seitz engaged in acts demonstrating a pattern of gross judicial misconduct, namely:

   A. Installation of a telephone listening device;

   B. Abuse of contempt power;

   C. Unprofessional relationship with and hostile attitude towards employees;

   D. Wilful neglect of adoption docket and refusal to respond to requests by the SCAO;

   E. Failure to file reports with the SCAO.

After hearing the testimony of witnesses and arguments of counsel, the master submitted his report on December 31, 1991. The commission met in open session to hear oral arguments regarding the master's report on March 9, 1992. It adopted in full the master's findings of fact and conclusions of law that provided the basis for its decision and recommendation of discipline issued on April 13, 1992.

The commission concluded that Judge Seitz was guilty of judicial misconduct that served to under-

---

[3] The commission has the burden of proving the allegations contained in the complaint by a preponderance of the evidence. *In re Loyd,* 424 Mich 514, 521-522; 384 NW2d 9 (1986). The record is reviewed de novo by this Court. *In re Somers,* 384 Mich 320, 323; 182 NW2d 341 (1971).

mine the effectiveness of the judiciary and has engendered public disrespect for the office he holds. The commission stated that Judge Seitz has demonstrated, in a number of instances, over a substantial period of time, that he does not possess those qualities essential to be a competent judge, and that his wilful violations have impugned the honesty and integrity of his court and the entire Michigan judiciary. Therefore, the commission recommended that the Supreme Court remove respondent from office, and bar him from ever again holding judicial office.

It becomes our task, by reviewing de novo the record of this case, to conclude whether "the conduct charged to Judge [Seitz] and found by the Commission is established by the record. The issues for our consideration, then, are whether that conduct is of a nature warranting discipline and, if so, whether removal, as recommended by the Commission majority or some other form of discipline should be imposed." *In re Bennett,* 403 Mich 178, 184; 267 NW2d 914 (1978).[4]

### I. FACTS & ARGUMENTS

James McCauley Seitz has a history of being unable to work in an amicable environment with anyone, be it people of authority, co-workers, or employees. When he first became a judge of the Monroe County Probate Court in 1977, hostilities began almost immediately between him and the chief judge and only colleague on the bench, Harry

---

[4] Our power of review de novo does not prevent us from according proper deference to the master's ability "to observe the witnesses' demeanor and comment on their credibility." [*Loyd,* n 3 *supra* at 535.]

Seitz. Judge Harry Seitz resigned in 1985.[5] Before his vacancy was filled, the respondent discharged Harry Seitz' court reporter-secretary, Mrs. Trowbridge, which led to legal action by her against the respondent and Monroe County.

Joseph Costello, with the urging of respondent, was appointed to fill the vacancy. What began as an amicable relationship between the two judges quickly deteriorated. The situation was so hostile, the then Chief Justice of this Court appointed Court of Appeals Judge JOHN GILLIS to act as chief judge[6] and assigned the State Court Administrator to act as special administrator of the Monroe County Probate Court. Judge GILLIS named Judge Costello as chief judge pro tem, resulting in his becoming acting chief judge when the appointment of Judge GILLIS as chief judge ended at the end of 1988.[7]

Since that time the Monroe County Probate Court has been in a state of disarray. In referring to Judge Seitz and Judge Costello, the master summarized as follows:

> They have overwhelmed associates, staff, the State Court Administrator's Office and the Judicial Tenure Commission with complaints against one another, and have generated an impressive volume of complaints from others. Staff, caught up in the turmoil, have become pawns between the two, compelled to work in an environment of suspicion and hostility. Contact was reduced to written memoranda, employees made notes of events and compiled dossiers on judges and each other. Some of them brought law suits and one went to jail. Respondent secretly taped his telephone conversations.

[5] The two men are not related.

[6] In the 1987 election for chief judge, each judge voted for himself.

[7] Pursuant to MCR 8.110(C)(5).

Central to an understanding of much of what transpired in the period during which the charges against respondent arose is his relationship with his secretary/court reporter. In discussing that relationship, the master stated:

In early 1983, Cindy Paz was hired by respondent to be his secretary-recorder. Mrs. Paz, now Mrs. Cameron, failed the test for court recorder three times but was kept on the job by respondent and a bizarre relationship developed. She was described as rough, which is a fair description. Indeed, the tenor of conversation between the two, in the presence of other court staff or in private, took on the atmosphere of a bawdy house with sexual references and gifts of a crude and vulgar nature. Both respondent and Mrs. Cameron deny that a sexual relationship existed between them; if not, it would appear that respondent was trying to create one. He hinted to her that they should run off together; he discussed his matrimonial problems with her and described his wife to her in the most unflattering terms. He would drop in at her home at all hours of the day or night, often bringing liquor with him; he bought her expensive clothes. He was generous and helpful to her. And he expected absolute loyalty of her in his conflicts with Judge Seitz, Judge Costello and others, insisting that she refer to them in the crudest of terms and that she avoid contacts with them.

\* \* \*

After the divorce of Mrs. Paz, in 1989, respondent drank heavily, talked more of his unhappy marriage, made suggestions to Mrs. Paz that they might run off together, and told her not to rush into any relationship with anyone else as he might be divorced. He would sometimes pass messages to Mrs. Paz through her friend, Irene Leonard, and in January of 1990 he told Mrs. Leonard (who told Mrs. Paz) that he was going to give Mrs. Paz a trip to Florida. . . . Mrs. Paz did not intend to and did not go to Florida. Later Mrs. Paz, without telling respondent, become engaged to Larry Cameron, an

intake worker at the Youth Center. On Feb. 7, when respondent learned of the engagement from someone else, he vomited. He then gave her a bizarre series of notes and tapes, and sent her a message through Mrs. Leonard not to come to work because he might hurt her. Mrs. Paz sought employment elsewhere in the county system . . . and, with her new husband, is now suing respondent.

It was in this milieu that the following episodes occurred.

### A. TELEPHONE LISTENING DEVICE

In the summer of 1988, Mrs. Cameron, suspecting that her husband was involved with another woman, asked Judge Seitz to install a tap for recording conversations on her home telephone. She alleges that Judge Seitz accompanied her to Radio Shack, insisted on purchasing the equipment himself with his credit card, and assisted her in installing the telephonic eavesdropping device. Judge Seitz emphatically denies purchasing and installing such equipment.[8]

He does not deny that his assistance was requested, but that he declined the request after conferring with his friend, Judge James Carr, a United States Magistrate for the Northern District of Ohio. Judge Carr informed Judge Seitz that recording a third-party conversation is a felony and thereafter, according to respondent, he had no

[8] Judge Seitz offered as evidence supporting his view of the events his credit card records indicating that he did not purchase on credit any equipment from Radio Shack as alleged by Mrs. Cameron. The master and the commission denied his request to admit the credit card records. Judge Seitz acknowledges that he installed a telephone listening device on his office telephone in the Monroe County Probate Courthouse. He testified that Mrs. Cameron was with him when he purchased that equipment. The receipts indicating the purchase of the telephone listening device equipment show that Cindy Cameron and Judge Seitz were both at the same Radio Shack on August 3, 1988, and they both purchased telephonic listening equipment.

involvement in the matter.[9] He testified that he was later informed by Mrs. Cameron that someone else helped her install the device.[10]

The master concluded that, although the testimony of the two was diametrically opposed, Mrs. Cameron's was the more credible. The commission agreed. They specifically found that Judge Seitz had violated the eavesdropping statutes, MCL 750.539c; MSA 28.807(3) and MCL 750.539f; MSA 28.807(6), by installing a telephone tape recording system at the home of Mrs. Cameron. In terms of specific grounds of misconduct, the master stated:

> His violation of the criminal code violates virtually all of the Canons of Judicial Ethics and is misconduct under MCR 9.205(C)(4), clearly prejudicial to the administration of justice.

On the same topic, the commission concluded:

> Finally and most egregiously, Respondent's violations of the criminal statutes betray his very oath of office. By installing the surveillance device and by providing Mrs. Cameron with the device,

[9] Judge Seitz argues that it was error requiring reversal for the master to exclude the testimony of Judge Carr on this issue. The commission denied a motion to hear this evidence.

Judge Seitz also moved to admit the transcript of a tape recorded conversation he had with Cindy Cameron establishing that he did not know how to install a telephone listening device. The commission also denied this motion.

[10] Judge Seitz offered, for the first time before the commission, testimony of Terrence Gallagher, whom respondent learned had spoken to Cindy Cameron about the installation of the telephone tape recording device at her home. Judge Seitz alleges that Mrs. Cameron admitted to Mr. Gallagher that respondent refused to assist her in setting up the equipment.

Judge Seitz asserts that the proposed testimony of Terrence Gallagher is highly significant because it directly related to the credibility of Cindy Cameron. Judge Seitz argues that Cindy Cameron has commenced two lawsuits against him and that the statement is the admission of a party-opponent under MRE 801(D)(2), and therefore, not objectionable hearsay.

knowing her purpose, Judge Seitz was guilty of
felonious conduct, grossly inappropriate to this
office. There can be no greater offense to the
judicial system than a judge who has such con-
tempt for the law that he breaks it as it suits him.

This alleged misconduct by Judge Seitz amounts to
the only significant factual dispute in the matters
at issue in this case—whether or not he partici-
pated in the installation of an eavesdropping de-
vice, an act that could constitute a felony.

Although we might be inclined to honor the
request for additional testimony were we to accept
the finding of an act that would constitute a
felony, we need not do so. The undisputed facts
demonstrate Judge Seitz' embroilment in his em-
ployee's marital dispute, use of his own recording
device to surreptitiously record conversations, and
knowledge that his employee also intended to
commit and had commenced what he believed to
be a felony. Such actions, while individually not
necessarily constituting a specific charge, support
our conclusions regarding Judge Seitz' overall lack
of judicial temperament and sense of propriety as
developed in this opinion.[11]

## B. ABUSE OF CONTEMPT POWER

In November of 1988, Judge JOHN GILLIS, acting
as chief probate judge assigned by the Supreme
Court, issued an administrative order that re-
quired youth home residents to have their hear-
ings conducted at the youth home, a facility oper-
ated under the direction of the probate court for
the detention and treatment of juveniles. The

---

[11] In this and the succeeding four episodes of alleged misconduct,
for reasons that will be set forth in our conclusion, we will refrain
from specifically designating the specific provisions of the canons or
MCR 9.205 that apply to each episode.

youth center is a maximum detention facility, and this order was issued for security reasons and to avoid transportation to the courthouse.

In January 1989, when Judge Costello assumed control of the court after the assignment of Judge GILLIS expired, the superintendent of the youth center was Daniel Gentner. Judge Costello, who favored the administrative order, informed him that it was to be followed and that juveniles were not to be brought from the center to the courthouse for hearings.

Judge Seitz, who did not favor the order, issued orders in two cases contrary to Judge Costello's directions to Mr. Gentner.[12] However, hearings were not held because the juveniles were not brought from the center. During the third week of January, Mr. Gentner met with Judge Seitz to discuss the conflicting orders. Judge Seitz told him that Judge GILLIS' order was invalid. Mr. Gentner said that he did not want to disobey Judge Seitz, but that he felt he was required to follow the orders of the chief judge. Judge Seitz indicated that he recognized Mr. Gentner's position. He did not, however, inform Mr. Gentner that he intended to comply with the order. In fact, Judge Seitz immediately scheduled two hearings to be held in his courtroom. Mr. Gentner did not transport the juveniles from the center. Instead, the hearings were held by conference call.

Judge Costello then issued Administrative Order No. 1989-2, a verbatim copy of Judge GILLIS' order. He submitted the order in February 1989 to the State Court Administrator's Office for approval under

[12] Judge GILLIS never submitted the administrative order to the State Court Administrator for approval; therefore, the order did not comply with the provisions of MCR 8.112. As a result, Judge Seitz believed that the order was not legally binding.

the court rule. The order was approved in March 1989.

The order continued to be a topic of discussion between Judge Seitz, Judge Costello, and the scao. On May 5, 1989, Judge Seitz issued an order to the youth home director, stating that on May 10 the director, Mr. Gentner, was to release a juvenile female to her father after 9:00 a.m. for a hearing to be conducted in the courthouse that afternoon.[13] The order contained the statement that failure to comply would be deemed contempt. This caused the master to conclude that Judge Seitz was deliberately trying to trap Mr. Gentner.[14] Mr. Gentner expressed his concern about the order to Judge Costello, who instructed Mr. Gentner not to release the girl to her father. Mr. Gentner testified that in any conflict, he thought he would be required to follow the directive of the chief judge. When the father came to the center that morning, he was told that his daughter could not be released.

Judge Seitz sent deputies to the youth home and had Mr. Gentner arrested and brought to his courtroom. Judge Seitz conducted a "mock" hearing devoid of due process. When Mr. Gentner asked for counsel he was ignored. Judge Seitz ordered that Mr. Gentner call the youth home and have the girl released. Mr. Gentner respectfully

[13] The order stated in pertinent part:

> The Court having received the recommendations of the pre-dispositional assessment conducted at the Monroe County Youth Center, and those recommendations being that [the juvenile] be released to her father, now therefore:
> It is ordered, that this matter be and is hereby scheduled for a *dispositional hearing* on: Wednesday, May 10, 1989 at 2:45 p.m. in Courtroom #305 of the Monroe County Courthouse. [Emphasis added.]

[14] Mr. Gentner testified that he had never received an order that contained a contempt provision in his seven years as a supervisor.

cited the order and directives of Judge Costello.[15] Judge Seitz found Mr. Gentner in contempt of court and ordered him jailed.[16] Judge Seitz accused his colleague, Judge Costello, of obstruction of justice and requested that the prosecutor bring criminal charges. He also filed a grievance against him with the Judicial Tenure Commission.[17]

Judge Seitz argued that he was not required to follow the order because it was never published and he was never given a copy of it after it was approved. MCR 8.112(B) contains no requirement for publication of administrative orders or the giving of notice. Judge Seitz was aware that the order had been issued by Judge Costello and that it had been submitted for the SCAO's approval. He also was aware that both Judge Costello and Mr. Gentner considered it to be effective. He testified that he did not know the order had been approved by the SCAO, nor did he bother to make any inquiry with regard to whether the order had been approved. The master found that the testimony was "an outright falsehood or contemptuously indifferent to the necessities of judicial administration."

Judge Seitz argued that it was common practice to release children before a hearing if the recommendation was that they be sent home on probation. Judge Seitz states in his brief that it was his intention to permanently release the juvenile on probation, and, therefore, the juvenile was no

---

[15] It should be noted that there was no requirement by rule or statute that the juvenile actually be present at the hearing.

[16] Mr. Gentner spent five hours in jail. He was not officially booked and printed.

[17] Judge Seitz testified that only that afternoon did he find a memo in his office from Judge Costello, dated the day before, with directions for this case. Attached to the memo were a copy of the order and a copy of the letter from the SCAO approving the order. The order was approved in March and these events transpired in May.

longer a party "detained at the Monroe County Youth Center" and Administrative Order No. 1989-2 did not apply.[18]

After making findings of fact on this topic, the master made the following observations:

> No conclusion can be reached but that this was an abuse of judicial power for the sole purpose of humiliating the Chief Judge Pro Tem and perhaps subjecting him to prosecution on a trumped up charge of obstruction of justice. The Superintendent of the Youth Center, whose sole offense was following the orders of Judge Costello, was to be humiliated as well. Respondent's stubborn resolve not to conform to Administrative Order 1989-2 could have been accomplished by more subtle and considerate means than those employed here. And, had respondent any concern for his court and for his court's employee, Mr. Gentner, he could have resolved this particular case in many other ways . . . by adjournment, by using an order to show cause rather than a bench warrant, or even by going forward with the hearing without the presence of the juvenile. Respondent testified that he felt sorry for Mr. Gentner, but it is clear that he had no feeling whatever for him. His conduct was an abuse of judicial power so grossly prejudicial to the administration of justice, MCR 9.205(C)(4), as to deserve the severest sanction.[19]

In agreeing with the master's findings, the commission concluded that Judge Seitz abused his

---

[18] Administrative Order No. 1989-2 states in pertinent part:

> *All hearings* will be conducted in the hearing room of the Monroe County Youth Center by the judge assigned to the case by blind draw. . . . All formal hearings, including *dispositional hearings,* . . . will be conducted by the judge of record for the matter as assigned by blind draw. [Emphasis added.]

[19] See *In re Hague,* 412 Mich 532, 554-555; 315 NW2d 524 (1982), where the unjustified threat of contempt was found to constitute misconduct.

judicial power for the sole purpose of humiliating others in violation of Canon 3A(9) of the Code of Judicial Conduct.[20]

The respondent would have us resolve this incident on the question whether he knew about the approval of the administrative order by the SCAO and whether this factual situation was in violation of the order. While we think both questions can be answered affirmatively, it is sufficient to find, as did the master and the commission, that the facts amply support the conclusion that Judge Seitz was intent upon subverting the rules of his court and the decisions of his chief judge with which he disagreed, and that in doing so he demonstrated a penchant for creating tension and contention in the courthouse.

The master and the commission have properly found, as do we, that the facts of this episode amount to a violation of the standards of judicial conduct and are deserving of sanction.

### C. UNPROFESSIONAL RELATIONSHIP WITH AND HOSTILE ATTITUDE TOWARDS EMPLOYEES

The formal complaint charged that Judge Seitz encouraged his secretary, Mrs. Cindy Cameron, to be uncivil toward other court personnel, describing his colleagues and others in offensive and obscene language. Respondent's own witness, Ms. Nina Jordan, testified about his abusive language to her about Judge Costello's personnel and the Probate Registrar's office.

---

[20] A judge should adopt the usual and accepted methods of doing justice; avoid the imposition of humiliating acts or discipline, not authorized by law in sentencing and endeavor to conform to a reasonable standard of punishment and not seek popularity or publicity either by exceptional severity or undue leniency. [Canon 3A(9).]

In December 1989, Mrs. Cameron and Judge Seitz were invited to Judge Costello's staff Christmas luncheon. When Mrs. Cameron informed Judge Seitz about the event he told her that if she was planning on going, she could pack her "F 'ing bags." He then wrote her a memo rationalizing his strong opposition to the luncheon and also discussed office civility in general.

For two years we've been deliberately excluded from the Christmas lunch by the worthless, juvenile, dishonest, immature[,] brain dead idiot down the hall.

\* \* \*

[I didn't get any support when] all those terrible things were printed about me in the paper after the bald headed fucking political hack from the Court of Appeals said all those lies in the newspaper.

\* \* \*

I did 90% of the work in this Court when fucking worthless Harry Seitz was here—he only did the uncontested estate hearings and all the adoptions. He never conducted a trial, and he dumped half of the crazy people hearings on me because that required a little work.

I also patiently waited and waited and waited until I would be the Chief Judge and change things—I had to wait until Harry left.

Then, stupidly, I tried to treat Costello as an equal, and not do the things to him that I had been subjected to. I also did all sorts of things for the pigs across the hall—stupid little things—like leting [sic] them wear pant suits, and take time off when they needed it for family emergencies—things that Harry never allowed.

I got what I deserved for trying to be nice and decent to these people—kicked in the face repeatedly and being subjected to ridicule and criticism, led by ignorant fat assholes like Carol Thurman.

\* \* \*

I don't think you realize how strong my feelings are about this, and how deep and intense my hatred is for him and for what he's done to a court that I built up for 12 years.

\* \* \*

[T]he only person I can rely on is you, or the person that occupies your position. That position is my personal employee, and loyalty has to be 100% to me—not to anybody else.

I know that its [sic] difficult sometimes, especially when you may find it fun to go with the rest of the staff or whatever. But the situation here doesn't permit that split loyalty.

\* \* \*

You enjoy a lot of job privileges that nobody else is entitled to, and I want the assurance from you that I do have 100% loyalty. I can't and won't continue with anything less.

\* \* \*

I'll do anything in the world for you, as long as your loyalty is to me and not divided between me and the staff. . . .

I'm being totally honest with you, and I am telling you that it really makes me angry when you're even civil to these assholes who deliberately screw me like that. If you think what they're doing to me is O.K., and you treat them as great friends when they screw me, then I wish you'd move across the hall and work over there. . . .

I need your assurance that I can depend on you, because if the recommendations of the Court Administrator aren't followed this time [referring being appointed Chief Judge], things here are going to be ten times worse than they ever were, and the whole place is going to wind up destroyed. And, if that has to happen, they'll have gotten exactly what they deserve. And I'm going to have to have somebody I can rely on to support me.

\* \* \*

More than anything else, I want our relationship to continue, but it has to be with loyalty and

understanding there. There's no in-between on this
one. My loyalty to you is 100%, and it has to be
the same in return.

I have to know where you stand so I can plan
appropriately.

I told you last week I take care of those who
take care of me. I treat the others accordingly. I
want you to look out for me as much as I look out
for you.

On February 7, 1990, Judge Seitz learned that
Mrs. Cameron was going to remarry, whereupon
he became visibly upset and began swearing. He
left for the rest of the day leaving behind a note to
Mrs. Cameron stating, among other things: "I'm
sick—and if what someone downstairs [said] is true
—I'm really goddamn sick and disappointed—more
than you can possibly know."

On February 9, 1990, after ignoring her for two
days, Judge Seitz sent Mrs. Cameron a series of
notes and a tape. One of the notes indicated that
Judge Seitz wanted to talk with Mrs. Cameron,
but was too upset and did not want anything
"bad" to happen. The master found that this was
an implied threat to hurt Mrs. Cameron. Mrs.
Cameron decided to resign and was gone within a
week.[21]

---

[21] At the hearing, Judge Seitz attempted to introduce documentary
evidence of complaints by Judge Costello about himself and his
secretary. The evidence was offered for the purpose of establishing his
existing mental, emotional, and physical condition for purposes of
mitigation. He argued that his state of mind at certain points in time
was pertinent because it reflected upon his general capacity to con-
duct himself as a judge.

The master ruled that the evidence documenting Judge Costello's
complaints was not admissible, sustaining hearsay and relevance
objections by the examiner. We are not convinced that any error in
the use of the master's discretion in excluding this evidence was,
under all of the circumstances of this case, harmful. As we said in
*Jenkins,* "The record contains more than ample evidence . . . to
support the findings of the master and commission." *In re Leon
Jenkins,* 437 Mich 15, 28-29; 465 NW2d 317 (1991) (citing MCR
9.203[D]).

The following are excerpts from the transcript of the tape Judge Seitz made after learning that Cindy Cameron was engaged to be married:

> I can't tell you how crushed and hurt and devastated and destroyed I was when I heard what you did; and, we've come so far together I feel like I've failed—just totally failed. Trying to build you up and get your life going again and get it going right. We've been through a hell of a lot together, and I tried to help you in any way I could. . . . I care what happens to you more than I care what happens to any other adult person in the world. It's unqualified caring. I've never asked anything in return for that. And I just want you to try to understand how I feel. Doing this destroyed really what little faith I had left in myself to judge people's character. . . . I guess, the way I feel is, the person I live with out there and Costello are right. Stupid, useless, worthless, my judgment of people and their character is no God damn good. . . . I came upstairs when I found out. About two seconds after you went out that door I threw up in there. It bothered me that bad. I've lost what little self-confidence I have in myself of judging another person's character because of this. . . . I've got you working in a position that's the highest position in the Court, other than my position. A position where I have to have total and complete trust and faith in you, your openness and your honesty with me. And, now I find out that you hide things from me. That's really shattered a lot of my faith and trust. . . . I told you many times I care about you. . . . And it was, it was unconditional caring. . . . I've told you before and I've written in a note to you, and I've told you I'd do anything in the world for you. And I never expect anything back. . . . Your life has been terrible. You've gotten hurt more than you understand—I think—by what's happened to you. Your life has been just a series of tragedies. It's gonna continue. . . . I feel betrayed. I feel my faith in you and in me and my judgments just shattered

and destroyed. I failed again, terribly. . . . We've never had any romantic thing between us. . . . After all the terrible, terrible things that have happened to me here over the last two years, with GILLIS and Costello and all those pricks, and getting knocked out after waiting eight or ten years to get in command and control of the God damn court, and all that being taken away and destroyed. You know how much I hate coming in here. . . . I don't learn. I'm too stupid. And they go get Costello in here. I help Costello. I take the stupid ignorant bastard out of a $16,000.00 a year job in a law firm that's trying to get rid of his ass. Make all sorts of political enemies. Bust my ass, pull all sorts of strings, go out on a limb, stick my neck out, and I get the guy $88,000.00 a year, only to be fucked over again. And now, it's happened again. And it's happened by the one person in the whole world I never ever thought would do it. . . . And you promised me that you wouldn't grab the first thing that came along that didn't treat you like a piece of shit. And you've done that. . . . [Y]ou need to stand on your own two feet first. You need to do that to build up your own self-esteem. You don't do that by grabbing the first white thing that comes along, that doesn't knock you around and call you a psychotic cunt, and treats you like a piece of worthless shit. . . . I've told you before that I would do anything for you. I'll help you out any way you need help. No strings attached. There never have been. . . . When you were a barefoot little hill ape running around out there—and got you to be a sophisticated lady. . . . But when a friend fucks up and hurts themself, it hurts worse than anything else in the world. Cindy, I just feel shattered and completely and totally disappointed, because you're making—you're making a terrible mistake and you're selling yourself and your son way, way short by doing this so soon. . . . And, I'll help you and give you whatever you have to have. No strings, no repayment, no nothing, because I care that much about you. . . . I've spent the last two nights—I know now what you went through

with your second husband. I spent the last two
nights laying on the couch crying. I just—I feel
like I've got so much invested in you. . . . I can't
take it. I'm angry at myself. I really, really am
angry at myself, because I failed. I didn't keep you
from doing this. I should have known that you
would do this; and, I didn't see that. You promised
me you wouldn't. We kept going over that. . . .
I'm a rotten son of a bitch; and, I know that.

The master concluded and the commission
agreed that Judge Seitz' intemperate conduct with
respect to other court personnel and his insistence
that Mrs. Cameron treat them in the same fashion
is a violation of Canon 3B(2) of the Code of Judi-
cial Conduct;[22] is prejudicial to the public confi-
dence in the judiciary, contrary to Canon 2B;[23]
undermines the integrity of the judiciary, contrary
to Canon 1;[24] and is prejudicial to the administra-

---

[22] A judge should direct his staff and court officials subject to
his control to observe high standards of fidelity, diligence and
courtesy to litigants, jurors, witnesses, lawyers and others with
whom they deal in their official capacity. [Canon 3B(2).]

[23]

CANON 2 A Judge Should Avoid Impropriety and the Appear-
ance of Impropriety in All His Activities

\* \* \*

B. A judge should respect and observe the law and should
conduct himself at all times in a manner that promotes public
confidence in the integrity and impartiality of the judiciary.

[24]

CANON 1 A Judge Should Uphold the Integrity and Indepen-
dence of the Judiciary

An independent and honorary judiciary is indispensable to
justice in our society. A judge should participate in establish-
ing, maintaining, and enforcing, and should himself observe,
high standards of conduct so that the integrity and indepen-
dence of the judiciary may be preserved. A judge should always
be aware that the judicial system is for the benefit of the
litigant and the public, not the judiciary. The provisions of this
Code should be construed and applied to further those objec-
tives.

tion of justice, MCR 9.205(C)(4).[25] See *Bennett, supra* at 192-193.[26]

In this episode, the respondent, in his own words, gives more than ample testimony to the siege mentality that is at the root of many of his actions and to the harm that resulted. The commission has more than adequately satisfied its burden of establishing sanctionable conduct that cuts across a great number of judicial canons and professional standards. We agree with its conclusion.

### D. WILFUL NEGLECT OF ADOPTION DOCKET AND REFUSAL TO RESPOND TO REQUESTS BY THE SCAO

The problems underlying this charge began with the departure of respondent's secretary, Cindy Cameron, who played a large role in processing adoption cases. After Mrs. Cameron left the court, the respondent asked Mrs. Irene Leonard to act as his secretary until he obtained a new one. Mrs. Leonard was the adoption investigator for the

---

[25] A judge is guilty of misconduct in office if . . . the judge's conduct is clearly prejudicial to the administration of justice. . . . [MCR 9.205(C)(4).]

[26] Judge Seitz unsuccessfully argued before the commission that it hear the testimony of the examiner's expert, Dr. Elliot Luby. Dr. Luby examined respondent, administered psychological tests, and wrote a report, which we have reviewed, essentially agreeing with respondent's expert, Dr. Douglas Sargent. Although Dr. Sargent testified, Judge Seitz did not move to produce the testimony of Dr. Luby before the master. This evidence pertains to the mitigation defense, see below, and concludes that he would be able to return to his position as judge. We do not think that the testimony from an additional behavioral scientist opining on the ultimate question of respondent's fitness to hold judicial office would be helpful to the commission or this Court, given our sole responsibility to make this judgment. We find no error in the refusal to allow such testimony before the commission.

The commission also denied Judge Seitz' motion to hear testimony from Dr. Douglas Sargent, who testified before the master. We do not see this as an abuse of discretion.

court and was somewhat familiar with the adoption proceedings. She did not, however, have training or experience with respect to the additional duties previously performed by the respondent's secretary. With no training provided, Mrs. Leonard was forced to teach herself by reviewing old files.

Court procedure apparently went well for a brief period. When a case was ready for hearing, Mrs. Leonard would obtain a date from Judge Seitz and the matter would proceed. His relationship with Mrs. Leonard inexplicably soured in April 1990 after he returned from a vacation and learned that Mrs. Leonard was participating in Ms. Cameron's wedding. Mrs. Leonard testified that Judge Seitz avoided her, made himself inaccessible, literally would not talk to her, and would not respond to her requests for hearing dates. She made the situation known to the court administrator, Mr. Mario Pace.

During this period, Judge Seitz was complaining to Mr. Pace about Mrs. Leonard. He also complained that Mrs. Leonard was bothering him and not getting her paperwork right, but he never gave Mr. Pace any examples with respect to what she was doing wrong, nor did he ever tell Mrs. Leonard what she was doing wrong, if indeed she was doing anything wrong.

In place at the court was a "chain of command" administrative order, which directed that any job performance complaints a judge might have about any court employee were to be handled through the court administrator, Mr. Pace. It was Mr. Pace's responsibility then to deal directly with the employee. Additionally, court employees were not to communicate directly with the judges. Any complaints were to be directed to their immediate

supervisor, who in turn would contact Mr. Pace.[27] Judge Seitz argued that because of the administrative order, he could not tell Mrs. Leonard what had to be done or how to do it. He could not give her any instruction or direction. Judge Seitz claimed that the "chain of command" policy was the reason for the delays in his courtroom and for why he could not handle the problem more effectively. Because of a breakdown in communication, no one took the responsibility of ensuring that Mrs. Leonard was trained properly or performed her duties correctly.[28]

The master found Judge Seitz' reluctance to speak to Mrs. Leonard compelled neither by the language of the order nor by common sense. He found Judge Seitz' attitude to be contrived, serving as a guise for his refusal to work with a court employee.

After the breakdown in communication between Judge Seitz and Mrs. Leonard, Judge Seitz began keeping files in his office to which Mrs. Leonard had no access. As a result, there were cases in which Judge Seitz set hearing dates or signed orders of which Mrs. Leonard would have had no knowledge.

Mrs. Leonard met with the Region I Court Administrator, Herb Levitt, on June 19, 1990, to voice her complaints about Judge Seitz' refusal to communicate with her. These complaints were relayed to personnel from the State Court Admin-

[27] Administrative Memorandum, September 2, 1987.

[28] Judge Seitz argued that it was error requiring reversal for the master to exclude an exhibit which showed that Judge Costello demanded that Judge Seitz follow the "chain of command" policy. The commission denied the motion to hear additional evidence. Judge Seitz has made an offer of proof by submitting the "chain of command" memo in an appendix of exhibits.

We think the voluminous testimony on this issue rendered any possible error regarding the master's exclusion of this exhibit harmless.

istrator's Office. At the meeting, which Assistant
Region I Court Administrator, Greg Ulrich, also
attended, Mrs. Leonard presented a list of adop-
tion cases that she felt were being neglected by
Judge Seitz. Mr. Levitt relayed the list to State
Court Administrator, Marilyn Hall, who was also
acting as special administrator of the Monroe
County Probate Court.

Mr. Levitt and Mr. Ulrich met with Judge Seitz
and discussed, among other things, the pending
adoption cases. Judge Seitz indicated that Mrs.
Leonard was not preparing the files properly.

On July 12, 1990, the State Court Administrator
wrote to Judge Seitz, indicating that adoption
matters were languishing and, with respect to a
particular case, noting that the apparent refusal
"to discuss the case or give direction to a veteran
court employee who has attempted several times
to discuss the case with you" was objectionable.
Specific cases were listed as requiring action, and
Judge Seitz was directed to hasten these cases and
to apprise the State Court Administrator weekly
in writing regarding the progress and dispositions
made.

The State Court Administrator did not receive a
single contact from Judge Seitz. She attempted
calling him weekly until the end of August, but
never reached him. He neither returned her calls
nor reported by mail as requested.

Judge Seitz testified, however, that he never got
any phone messages from the State Court Admin-
istrator. He claims that "the entire issue became
one of confusion, missed cues and lack of commu-
nication between [himself], the SCAO and the Court
Administrator Pace." Although he did not contact
the State Court Administrator, he did discuss the
matters with the Region I Court Administrator. In
addition, the assistant Region I Administrator

kept in touch with the court director, Mr. Pace, regarding the neglected cases. After visiting the Monroe County Probate Court in August, the Region I Administrator was satisfied that the cases listed in the July 12, 1990, letter of the State Court Administrator were progressing satisfactorily, and he addressed a memorandum to the State Court Administrator on August 31 to that effect.

Mr. Pace had advised Mrs. Leonard not to disturb Judge Seitz and to put everything to him in writing. Thus, she documented a number of cases in which she had submitted written requests to him to set hearing dates. These requests were not responded to by Judge Seitz, which led to another intervention by the State Court Administrator.

On October 31, 1990, the State Court Administrator again wrote to respondent about the growing delays in certain adoption cases. She included a list of cases about which she was concerned. Judge Seitz was asked to review the list at once and to advise her of the dates they would be scheduled for hearing or explain why they could not. The letter expressly indicated that a response was expected no later than November 9.

The SCAO received Judge Seitz' unsigned response, dated November 9, on November 14, 1990. Judge Seitz testified that he had spent a significant amount of time preparing his response; however, review of that response indicates that he made no reference to the twenty-one cases to which his attention had been directed. The master found that he had not reviewed the files and had set no hearing dates. Instead of responding to the requests made by the SCAO, Judge Seitz responded with a seven-page complaint about the performance of Mrs. Leonard. The conclusion of the letter was that he was referring the files to court director Pace for review and that he would sched-

ule the cases for hearings within fourteen days of a certification of readiness from the director. Judge Seitz was apparently trying to bypass Mrs. Leonard on the ground that she had done a poor job in preparing the files; however, the master found that most of the files were in proper order and ready for action. At the hearing, Judge Seitz conceded that ten of the cases were ready and could have been set for hearing.

After the November 14 letter, Judge Seitz made no further effort to communicate with the State Court Administrator or her staff. He testified at the hearing that any response beyond that letter would have been redundant. The scao found respondent's letter to be an inadequate response.

On November 16, 1990, State Court Deputy Administrator Ferry directed Assistant Region I Administrator Ulrich to inspect the adoption files pending in Judge Seitz' court and to schedule cases for him. Judge Seitz was attending a seminar in Florida and could not be reached; however, Mrs. Leonard checked his docket book and found January 8, 1991, to be an open date. All open files were reviewed by Mr. Ulrich, with the assistance of Mr. Pace and Mrs. Leonard. A list was made and faxed to Mr. Ferry, who then wrote a letter to respondent.

The November 16 letter stated that inspection of the adoption files showed no reason for postponement of scheduling the cases in question. The letter also indicated that certain cases were set for hearing on January 8, 1991, and that all parties had been notified. The letter listed other cases that did not require a hearing but only that Judge Seitz decide a motion or sign an order, and directed that

Judge Seitz do so as soon as possible and no later than December 3.[29]

Judge Seitz did not respond to the letter, nor was any action taken to comply. The master found it quite clear that Judge Seitz did not even begin work on any of the files, and, although Judge Seitz argued that he did, he could not give an example of action taken on any files. The master found that review of the files would have taken only a few hours and that, had Judge Seitz done so, he would have been able to complete the cases by December 3 as requested by Mr. Ferry. Because Mr. Ferry heard nothing from Judge Seitz by December 3, 1990, he again wrote to Judge Seitz on December 4, requesting a report. This request was also ignored.[30]

On December 12, 1990, Judge Seitz scheduled two pretrial conferences for January 8, 1991, the same day the adoption hearings were scheduled. Apparently, these cases were going to be dismissed by the prosecutor, but they were listed for trial to further the prosecutor's efforts to resolve them. Upon learning that Judge Seitz had scheduled two cases for trial on January 8, 1991, the court staff concluded that Judge Seitz was going to ignore the adoption cases scheduled by Deputy Ferry. The

[29] Ten cases were set for hearing and nine others merely required a signature or a decision on a motion.

[30] The complaint alleges that Judge Seitz persistently failed, refused, or neglected to respond to inquiries of the SCAO. In attempting to defend against this charge, Judge Seitz offered evidence documenting his communication with SCAO officials. The examiner objected to the admission of such evidence as hearsay and irrelevant. The master ruled that the evidence was admissible for the limited purpose of showing that Judge Seitz was communicating with the SCAO; however, the contents of the documents were ruled inadmissible.

We do not find an abuse of discretion in the ruling of the master. Most of the communications were to initiate complaints with the SCAO and were not in response to SCAO inquiries and directives. As to those relatively few communications that were directly responsive, we find their omission from evidence to be harmless in view of the large number of SCAO inquiries that were not responded to.

scheduling was communicated to the SCAO, and the master found that, given Judge Seitz' failure to respond to Deputy Ferry's letters of November 16 and December 4 and the fact that Judge Seitz had taken no action on the matters that were dead-lined for December 3, it was reasonable to believe that Judge Seitz intended to ignore the January 8 hearings.

On December 14, Deputy Ferry instructed Mr. Levitt and Mr. Ulrich to go to Monroe County to obtain the files for the January 8 hearings in order that an outside judge, if needed, could be apprised of the matters. When asked about the apparent conflict, Judge Seitz responded that there would be no problem in handling the adoption cases, that the juvenile matters would not take long.[31] He also told them that the files were not available, that they were at his attorney's office, and could be picked up on Monday, December 17. The files were actually in Judge Seitz' office the entire time. He testified that he had become para-noid about the SCAO and that he kept the files to copy so that no changes could be made that would "set [him] up."

Deputy Ferry decided to assign Judge Kirken-dall, who had previously been approved by Admin-istrator Hall as an outside judge to hear the adoption cases on a stand-by basis, in light of Judge Seitz' statement that his attorney had the files.

On December 17, 1990, Mr. Ulrich went back to

---

[31] Even though Mr. Ulrich testified that when he scheduled the adoption cases with the respondent's secretary he told her that other matters could be scheduled that day, he also testified that he took the scheduling of the juvenile cases by Judge Seitz as an indication that Judge Seitz did not intend to hear the adoption cases. He stated that at the time of his conversation with Judge Seitz on December 14, he understood that the decision had already been made to assign Judge Kirkendall to hear the adoption cases.

Monroe, retrieved the files, and delivered them to Judge Kirkendall.

On December 21, 1990, Judge Seitz sent letters to at least six prospective adoptive parents indicating that their adoptions had been detained since the spring because of unsatisfactory preparation by a court adoption employee. The letter went on to state that he had obtained the files from the employee, reviewed them, corrected any mistakes, and set their cases for hearing so that adoptions would be complete before Christmas, but that the State Court Administrator, apparently upon learning that he had obtained the adoption files, had assigned the cases to an outside judge. Judge Seitz stated: "This action by a deputy State Court Administrator—who is neither a lawyer or [sic] a judge—has effectively prevented your adoption from being finalized before Christmas as I had attempted to do. I'm sorry that your case was one of the few which was caught up in the bureaucratic maneuvering." Five of the six known cases in which letters were sent were on the list of cases that Judge Seitz had been instructed to take action on by December 3. The sixth case was on the list of cases scheduled for January 8, 1991, but appeared to the master to be one that could have been concluded easily had Judge Seitz been willing to take appropriate action.[32]

On January 8, 1991, Judge Kirkendall heard cases scheduled for that date. Judge Seitz was at the courthouse and could have heard the cases himself. The master found that it was not misconduct for Judge Seitz to schedule two bench trials on that day in light of his acknowledgment that he could handle the adoption hearings because the

[32] The complaint does not charge respondent's December 21 letters to adoptive parents as misconduct. The master found, however, that they revealed respondent's lack of regard for the integrity and repute of the court.

trials would not take long.[33] Relying on that finding by the master, Judge Seitz argues that the recommendation of the commission is inconsistent.

Respondent denies that he failed or refused to perform his judicial duties. He argues that he was ready to schedule the cases for hearing within fourteen days of receipt of a certification from Court Director Pace that the cases were ready. Judge Seitz further testified that most of the cases at issue had no significant problems and could have been set for hearing in any event. The master found that respondent's failure to schedule the hearings was absolutely inexcusable.

Judge Seitz argues that findings by the master on this issue are against the great weight of the evidence and fail to consider the context in which Judge Seitz was forced to operate. Judge Seitz argues that he felt besieged, that it was more Mrs. Leonard's fault than his, and that he was not given the chance to clear his docket.

The master found and the commission agreed that Judge Seitz' behavior in the handling of the adoption cases constituted misconduct in office. More specifically, the commission found a persistent failure to perform judicial duties pursuant to MCR 9.205(C)(2);[34] a violation of the statutory directive that adoption cases are to have the highest priority in scheduling with an end to the earliest possible disposition, MCL 710.25(1); MSA 27.3178(555.25)(1);[35] a violation of the high stan-

[33] Judge Seitz never told anyone that the trials were dismissals. He simply said they would not take long.

[34] A judge is guilty of misconduct in office if . . . the judge persistently fails to perform his or her judicial duties. . . . [MCR 9.205(C)(2).]

[35] The Adoption Code provides:

All proceedings under this chapter shall be considered to

dards of conduct necessary to preserve the integrity of the judiciary pursuant to Canon 1 of the Code of Judicial Conduct;[36] a failure to dispose of business promptly contrary to Canon 3A(5);[37] and a persistent failure to diligently discharge his administrative responsibilities, maintain professional competence and judicial administration, and facilitate the performance of the administrative responsibilities of court officials contrary to Canon 3B(1).[38]

The essentially undisputed evidence of this episode clearly demonstrates yet another example of the respondent's seemingly tireless and sometimes effective efforts to avoid being "set-up" while doing his best to isolate himself from people and procedures that offended him.

A great deal of time, personnel, and administrative effort was expended to bring about a routine disposition of a group of uneventful cases that could have been accomplished by engaging in the kind of routine communication that keeps courtrooms and court dockets functioning throughout the state.

We find, as did the master and the commission, that this episode constituted misconduct under the Code of Judicial Conduct and the Standards of Judicial Conduct as prescribed by MCR 9.205 and should subject the respondent to sanction.

have the highest priority and shall be advanced on the court docket so as to provide for their earliest practicable disposition. [MCL 710.25(1); MSA 27.3178(555.25)(1).]

[36] See n 24 for text.

[37] A judge should dispose promptly of the business of the court. [Canon 3A(5).]

[38] A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials. [Canon 3B(1).]

E. FAILURE TO FILE REPORTS WITH THE SCAO

The formal complaint charged that Judge Seitz consistently failed, refused, or neglected to file "Undecided Matters" reports as required by MCR 8.107. The respondent failed to file such reports due on May 1, 1989, September 1, 1989, January 1, 1990, May 1, 1990, and January 1, 1991. The September 1, 1990, report was filed November 26, 1990.[39] These failures occurred despite the many letters and telephone reminders from the Region I Administrator's Office.[40]

The SCAO cannot monitor a judge's case management if the judge neglects to file the reports required by the court rule. The master stated that refusing to adhere to the rule is a failure to discharge administrative responsibilities under the rule. The fact that the SCAO accepted tardy filings from the respondent does not excuse his failure to comply with the rule.

The commission found that this behavior constituted conduct clearly prejudicial to the administration of justice contrary to MCR 9.205(C)(4);[41] a failure to discharge administrative responsibilities diligently and to facilitate the performance of the administrative responsibilities of court officials contrary to Canon 3B(1) of the Code of Judicial

[39] Although due on September 1 and filed November 26, the report was dated November 20, 1990. As of November 26, 1990, there were cases submitted for scheduling from as far back as July 20, 1990, that requested termination hearings. These cases from July were part of the group of cases scheduled to be heard by the visiting judge on January 8, 1991. Judge Seitz did not include these in his report filed November 26, 1990, although, arguably, they should have been listed. MCR 8.107. If Judge Seitz had filed the report on September 1, as the court rule requires, he would not have had to list these cases.

[40] Mr. Levitt, the Region I Administrator of the SCAO, sent letters on June 30, 1989, November 20, 1989, March 1990, June 1990, August 9, 1990, and November 9, 1990.

[41] See n 25 for text.

Conduct,[42] see *In re Carstensen,* 316 NW2d 889 (Iowa, 1981); and a violation of MCR 8.107.[43]

This is another factually undisputed charge of misconduct for failure to comply with an explicit routine administrative task. We agree with the commission's finding of misconduct and accept the recommendation that it should be the subject of disciplinary action.

## II. MITIGATION DEFENSE

Judge Seitz urges this Court to consider mitigating factors in determining a remedy. He does not assert that his conduct was at all exemplary or in good faith, but asks that his conduct be viewed in the context of the circumstances at the Monroe County Probate Court. The master summarized Judge Seitz' argument as follows:

> [I]t is argued that respondent suffered an adjustment disorder caused by stress primarily induced by an antagonistic fellow judge, aggravated by an inept or indifferent or biased Court Administrator's staff. This led to alcohol abuse, dependence on Mrs. Paz as an "ally," anxiety, and withdrawal. He felt threatened, perhaps even to the state of paranoia.

[42] See n 38 for text.

[43] MCR 8.107 states:

Every trial judge shall, on the first business day of January, May, and September of each year, file with the state court administrator a certified statement in the form prescribed by the state court administrator, containing full information on any matter submitted to the judge for decision more than 4 months earlier which remains undecided. The judge shall also set forth in the statement the reason a matter remains undecided. For the purpose of this rule the time of submission is the time the last argument or presentation in the matter was made or the expiration of the time allowed for filing the last brief, as the case may be. If the judge has no cases to report, the word "none" on a signed report is required.

The master and the commission rejected respondent's mitigation defense.

This Court has previously stated: "There is no doubt that 'good faith' should be considered as a mitigating factor to the acts of misconduct but not as an affirmative defense to charges of misconduct." *In re Laster,* 404 Mich 449, 461; 274 NW2d 742 (1979); *In re Lawrence,* 417 Mich 248, 267, n 14; 335 NW2d 456 (1983).

Judge Seitz and the examiner read this quotation as stating the principle that mitigation cannot be used in determining misconduct but can be used to determine the discipline to be applied. There is certainly authority for this view.

> [T]he physical and emotional difficulties that petitioner experienced during a portion of the period in question, while they certainly merit sympathy and may serve in mitigation of the sanction, cannot be accepted as justification per se. . . . His conduct as a judge must be evaluated on the basis of objective criteria applicable to all judges similarly situated within the system. [*Mardikian v Comm on Judicial Performance,* 40 Cal 3d 473, 485; 709 P2d 852 (1985).]

We first note that the purpose of judicial discipline is not to punish, but to maintain the integrity of the judicial process.

> The purpose of these proceedings is not to impose punishment on the respondent judge, or to exact any civil recovery, but to protect the people from corruption and abuse on the part of those who wield judicial power. [*In re Leon Jenkins,* 437 Mich 15, 28; 465 NW2d 317 (1991) (citing *In re Mikesell,* 396 Mich 517, 528-529; 243 NW2d 86 [1976]).]

In view of the fact that punishment is not a

purpose of judicial discipline, this does not leave much room for mitigation.[44] Nevertheless, we would not preclude the possibility that personal mitigating circumstances could be considered in determining the discipline to be imposed when, and only when, it does not compromise the first and foremost goal of protecting the judicial process. Any conflict between exercising such a deference to a personal problem of the officeholder and the demands of the judicial office would need to be reconciled in favor of the integrity of the office. A judgeship is a privilege, not a right.

> [W]hen one commits judicial misconduct he not only marks himself as a potential subject of judicial discipline, he denigrates an institution. Accordingly, a decision on judicial discipline must be responsive to a significant institutional consideration, "the preservation of the integrity of the judicial system." Institutional integrity, after all, is the core of institutional effectiveness. [*In re Probert,* 411 Mich 210, 225; 308 NW2d 773 (1981).]

As will be seen, there is no opportunity under the facts and circumstances of this case to mitigate the recommended action.[45]

### III. CONCLUSION

The specific instances of misconduct set forth are of varying degrees of seriousness resulting in varying degrees of harm to the operations and

---

[44] See *Kennick v Comm on Judicial Performance,* 50 Cal 3d 297, 342; 787 P2d 591 (1990) ("Protection of the public and of the integrity of the judiciary precludes allowing petitioner's reported physical or emotional difficulties to bar a determination of 'conduct prejudicial to the administration of justice' ").

[45] See *Gonzalez v Comm on Judicial Performance,* 33 Cal 3d 359, 377; 657 P2d 372 (1983) ("[I]t is well established that there can be no mitigation for maliciously motivated judicial misconduct" citing *Spruance v Comm of Judicial Qualifications,* 13 Cal 3d 778, 800; 532 P2d 1209 [1975]).

reputation of the Monroe County Probate Court and the administration of justice generally.

However, in our considered judgment none of these instances of misconduct is an isolated event, nor to be sure the result of inattention, lack of knowledge, or incompetence, but rather part of a mosaic of wilful, contentious, destructive, and sometimes malicious behavior. We are prompted to conclude that this is an occasion when the totality of the behavior is larger than the sum of its ingredients.

Oftentimes we are required to take disciplinary action solely on the basis of the actions of a judicial officer, while only being able to speculate regarding the motivations behind the misdeeds. In this case, however, because of the respondent's penchant for recording his thoughts and feelings, we are afforded more than just a glimpse at these innermost thoughts and feelings. It is not a pretty picture.

After nine days of hearings, including a great deal of testimony from the respondent himself, the master, Judge William R. Peterson, found the respondent to be "a calculating, manipulative, arrogant man, without feelings for others." We cannot disagree.

While we take no pleasure in exposing the personal travails of a troubled brother in the judicial family, our responsibility for the administration of justice, including a fair and measured review of the allegations against him, requires no less.

As we examine the expressions of Judge Seitz, it conjures up specific impressions of belligerence, vindictiveness, hostility, bitterness, disrespectfulness, and considerable perversity of will and motive. These characteristics resonate discordantly when compared with the Code of Judicial Conduct, more specifically:

A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers and of his staff, court officials, and others subject to his direction and control. [Canon 3A(3).]

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizens and should do so freely and willingly. [Canon 2A.]

(1) A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.
(2) A judge should direct his staff and court officials subject to his control to observe high standards of fidelity, diligence and courtesy to litigants, jurors, witnesses, lawyers and others with whom they deal in their official capacity. [Canon 3B(1)-(2).]

We conclude, therefore, that both by his actions and his expressed declarations as he went about the exercise of his duties, he has demonstrated an attitude, a mind-set, that leaves us firmly convinced that he is woefully unfit for judicial office. He not only exhibited a lack of the qualities from which judicial temperament springs, but he has exhibited a distinct pattern of injudicious temperament and conduct.

There are precious few canons of judicial ethics and standards of judicial conduct that have escaped the behavior of the respondent. However, because we view his behavior in its totality, we

prefer to isolate those canons and standards that go to the heart of his misbehavior rather than basing our findings on individual manifestations of his underlying difficulties. Accordingly, we find beyond doubt that the respondent is habitually intemperate within the meaning of Const 1963, art 6, § 30, and of the above-quoted canons of the Code of Judicial Conduct, all of which constitutes misconduct in office under MCR 9.205(C)(3) and (4).

We consider the respondent's behavior to be sufficiently serious and pervasive that his continuation in judicial office would be "clearly prejudicial to the administration of justice," and, therefore, adopt that part of the Judicial Tenure Commission's recommendation that removes the respondent from judicial office.[46]

Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.

CAVANAGH, C.J., and BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with BRICKLEY, J.

The following opinion was filed with the Clerk of the Supreme Court on February 3, 1993, after the release of the opinion of the Court on February 2, 1993—REPORTER.

LEVIN, J. (concurring in part and dissenting in part). The majority states that Monroe Probate Judge James McCauley Seitz, both by his actions and his statements, as he went about the exercise of his duties, had "demonstrated an attitude, a mind-set, that leaves us firmly convinced that he is woefully unfit for judicial office. He not only exhibited a lack of the qualities from which judicial temperament springs, but he has exhibited a dis-

[46] For the reasons set forth in Jenkins, supra at 29-30, we decline to adopt that portion of the commission's recommendation that would bar the respondent from ever again holding judicial office.

tinct pattern of injudicious temperament and conduct."[1]

The majority finds graphic support for some of these conclusions in a personal memo and cassette tape from Judge Seitz to his secretary, Cindy Paz Cameron,[2] which came to light when Cameron commenced an action in the United States District Court against Seitz and Monroe County approximately nine months to a year after the memo and

---

[1] *Ante,* p 627.

The majority concludes (*ante,* pp 627-628) that Seitz committed acts that constituted misconduct in office, persistently failed to perform his judicial duties, is *habitually intemperate,* and that his conduct was clearly prejudicial to the administration of justice.

The terminology follows the language of the constitutional provision authorizing discipline of a judge on the recommendation of the Judicial Tenure Commission:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, *habitual intemperance* or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings. [Const 1963, art 6, § 30(2). Emphasis added.]

But this Court said in *In re Mikesell,* 396 Mich 517, 535-536; 243 NW2d 86 (1976):

> While "habitually intemperate" as stated in the court rule and *"habitual intemperance"* as stated in the constitution are capable of being defined in several ways, the respondent contends that the only applicable meaning is the abuse of alcohol. We agree. [Emphasis added.]

There is no finding, nor evidence sufficient to support a finding, that Seitz abused alcohol in the sense referred to in the Constitution as construed in *Mikesell.*

[2] *Ante,* pp 605-607, where the majority set forth excerpts from a memo dated December 15, 1989, from Judge Seitz to his secretary/recorder, then Mrs. Paz, later Mrs. Cameron, and *ante,* pp 608-610, where the majority set forth excerpts from a cassette tape sent, on February 9, 1990, by Seitz to his secretary after he learned that she was engaged to marry another court employee, Lawrence Cameron.

cassette tape were sent by Seitz. These theretofore private communications reflect Seitz' unprofessional relationship with her, his unfavorable opinions of former Monroe Probate Judge Harry Seitz, and of Joseph Costello, a Monroe Probate Judge serving with respondent James McCauley Seitz, and his view that other court persons were aligned with Judge Costello and were adversaries. The memo and cassette tape also reflect that Seitz expected one hundred percent personal loyalty from Cameron and demanded that she view and treat other court personnel as adversaries.

The unstated assumption, reflected in the majority's statement that "Seitz has a history of being unable to work in an amicable environment with anyone, be it people of authority, co-workers, or employees,"[3] is that Seitz was responsible for the "discord" and "turmoil"[4] in the Monroe County Probate Court.

The master did not decide which of the two Monroe Probate judges was responsible for the discord and turmoil.[5]

I

The record does *not* show that Seitz and former

[3] *Ante,* p 594.

[4] Master's findings of fact and conclusions, p 1.

[5] The master declined to consider evidence tending to show that Costello was guilty of misconduct and responsible, or also responsible, for the discord and turmoil. The master did say, however:

They [Seitz *and* Costello] have overwhelmed associates, staff, the State Court Administrator's Office and the Judicial Tenure Commission with complaints against one another, and have generated an impressive volume of complaints from others. Staff, caught up in the turmoil, have become pawns *between the two,* compelled to work in an environment of suspicion and hostility. Contact was reduced to written memoranda, employees made notes of events and compiled dossiers on judges and each other. [Emphasis added.]

judge Harry Seitz were unable to work together. It appears, rather, that they did work together, although there were serious personal differences.

After Judge Harry Seitz retired, Seitz discharged Harry Seitz' secretary/reporter. The majority adverts to an action filed by the secretary/reporter claiming wrongful discharge.[6] Surely, this Court does not wish to be understood thereby as saying that in an action for wrongful discharge, a court may assume, simply because such an action has been filed, that the employer is unable to work in an amicable environment with employees.

The record shows that amity prevailed after Costello was appointed a probate judge by the Governor, for about a year and a half, until signs were posted on Seitz' door charging him with absenteeism. Seitz claimed that Costello was responsible, and there is some evidence tending to support that claim;[7] the master made no definitive finding in that regard.

The record shows that Seitz and Costello were indeed unable to work together after mid-1987. The record does not show, however, that, apart from the Seitz/Costello conflict, Seitz was unable to work with court employees, other than Daniel Gentner[8] and Irene Leonard.[9] Seitz' conflict with State Court Administrator Hall arose when she directed that he "coöperate" with Leonard.[10]

The disparaging comments set forth in the memo and cassette tape from Seitz to Cameron concerning court employees and persons in authority do not support the majority's conclusion that

[6] *Ante,* p 595.

[7] This and other courts have found jury submissible issues on evidence no less tenuous.

[8] See part VII.

[9] See part VIII.

[10] See part XI.

Seitz is unable to work with court employees and persons in authority. Mature and immature persons work with bosses and subordinates that they do not like and about whom, in private, opinions are expressed as derogatory as those expressed by Seitz in these private communications to his secretary. One of Seitz' many mistakes was to put it in writing—would "that mine adversary had written a book."[11]

Seitz may not properly be removed from office for what he thought, or for what he said in a private, personal relationship. Discipline may properly be imposed only for misconduct, not for misspeech *in a private, personal* relationship.

When Seitz and Costello could not agree in late 1987 who should be chief judge, Court of Appeals Judge JOHN H. GILLIS was appointed chief judge of the Monroe County Probate Court by the then Chief Justice. Herbert Levitt, Region I State Court Administrator, and Judge ROBERT PAYANT, then State Court Administrator, had recommended that Seitz be appointed. GILLIS named Costello as chief judge pro tem on Seitz' recommendation.

Fully familiar with the "discord" and "turmoil" in the Monroe County Probate Court, Levitt and PAYANT made that recommendation, which suggests that Seitz had not, in their mind, "demonstrated an attitude, a mind-set, that [left them] firmly convinced that he is woefully unfit for judicial office," or that he had "exhibited a lack of the qualities from which judicial temperament springs," or had "exhibited a distinct pattern of injudicious temperament and conduct."

II

Marilyn K. Hall, State Court Administrator,

---

[11] The Book of Job, 31:35.

who had been appointed Special Court Administrator for the Monroe County Probate Court in June, 1989, some time after GILLIS' term as chief judge concluded, wrote the Judicial Tenure Commission requesting an investigation of Seitz' conduct on September 12, 1990, and December 11, 1990.

Four months before the September 12 letter, the Judicial Tenure Commission, on May 15, 1990,[12] wrote Seitz and Costello advising that the commission had concluded its review of a number of grievances filed against them and had concluded that there was "at present, insufficient cause to issue formal complaints" against either of them.

A

The letter continued that "both" judges had "displayed behavior unbecoming members of the judiciary. Your petty bickering has not only required the attention of the Commission, but also the direct intervention of the Supreme Court."

The letter continued:

If individual episodes in your war with each other were reviewed, culpability for each of the many flare-ups could probably be individually assigned. Such an endeavor would be of doubtful value. On balance, when the totality of the events is examined, both of you are *equally to blame* for

---

[12] This was several months after Cameron had, on February 16, 1990, resigned her employment with the Monroe County Probate Court, but before November 21, 1990, when she commenced an action against Seitz in the United States District Court claiming that he had constructively discharged her because of the impending change in her marital status from former wife of Darwin Paz to wife of Lawrence Cameron. It was then that the private memo and cassette tape came to light.

the problems the Court has experienced.[13] [Emphasis added.]

---

13 The letter continued:

One of the most curious aspects of both of your written responses to allegations that you have engaged in feuding with each other in the past, is that you both have adamantly denied taking part in such conduct. If one assumes that you have been honest in your replies, this indicates a total blindness to the realities of the situation. While the two of you have denied feuding with each other, the public, the court staff, numerous local attorneys and the media see it otherwise. Several court employees have described themselves to the Commission's staff as "being paranoid" as a result of your hostilities. Attorneys have told the Commission's staff that they perceive your relationship with each other as being so bad, that the only solution they could think of was to decertify one of the two Monroe County Probate judgeships. One attorney interviewed by the Commission's staff, who at one time depended on probate assignments to supplement his practice, requested that his name be removed from the assignment roster to avoid having to deal with petty squabbling between not only the both of you, but also your respective court staffs who have been pulled into the fray.

Your behavior has created such turmoil at the Monroe County Probate Court that the Supreme Court was required to appoint Court of Appeals Judge JOHN H. GILLIS as chief judge during 1988. Later disagreements caused the Supreme Court to appoint State Court Administrator Marilyn Hall as special administrator on June 9, 1989, "to oversee the court and review all policies governing it." At that time the court administrator stated "public confidence in the court is shaken at this point." In a *press release* issued that day it was disclosed:

"The State Court Administrative Office investigation was prompted by the administrative problems that the Monroe County Probate Court has experienced as a result of *the inability of the court's two judges—Judge James McCauley Seitz and Chief Judge Joseph A. Costello, Jr.—to get along at the personal and professional level.*"

Such appointments and later disputes and disagreements have received extensive media coverage, all to the detriment of the proper administration of justice in the Monroe County Probate Court and resulting in the erosion of public confidence in the court system.

Ms. Hall's service as special administrator, which originally required a six month term, has been extended indefinitely to provide for the direct interposition of her staff. The Commission also intends to continue monitoring the Monroe Probate Court and will not hesitate to take formal action including the filing of charges, should there be a recurrence of the above described problems.

The letter stated that "you should both be aware that these grievances are not being dismissed. The Commission will tolerate *no further episodes of this nature.* You are warned that *any repetition of such conduct* will likely result in formal action against you." (Emphasis added.)

There is no evidence of "further episodes of this nature" or of "any repetition of such conduct." Hall, in her second letter, on December 11, 1990, requesting that the Judicial Tenure Commission investigate Seitz, said *"we have been successful in eliminating the public and private feuding which plagued the court."* (Emphasis added.)

The principal new allegations against Seitz, set forth in the December 11 letter, were his alleged failure to "coöperate" with Leonard, a Monroe County Probate Court employee, who prepared adoption cases for hearing and disposition, and his alleged failure to be more responsive to communications and directives from Hall and John Ferry, her deputy. Clearly, Hall regarded the new allegations against Seitz as of a different genre, as they were, and did not regard the evidence supporting this new allegation as evidence of "public and private feuding."

B

In another letter, also dated May 15, 1990, the commission wrote the Chief Justice and associate justices advising that over the last two years Seitz and Costello had "inundated the Commission staff with charges and counter-charges of impropriety," and that the commission had concluded that "[m]ost, *if not all* of the charges were either exaggerated or unsubstantiated," and that a thorough investigation had "yielded no evidence which would merit formal action by the Commission."

Among the charges so found by the Judicial Tenure Commission to have lacked merit is the Gentner contempt episode,[14] which the Judicial Tenure Commission, following the filing of the formal complaint in the instant case, found deserving of the "severest sanction."

The Judicial Tenure Commission renewed its May 16, 1989, request that the Supreme Court assign one of the two judges to visiting status away from his court for a six-month period. The commission explained that it was uncertain whether its resolution of the "matter" without formal complaint would "discourage further bickering between the judges. . . . The Commission views both judges as being extremely immature."

Part of the problem was that the "Monroe County Probate Court simply does not generate enough work to occupy the time of both judges." Judges Seitz and Costello had both agreed that "there was not enough work at the court to keep them busy. Both judges admitted that either of them, working with the assistance of their full-time referee, could handle the entire case load." Court of Appeals Judge Gillis, who served in 1988, advised the commission that the judges "had too much time on their hands. He further stated that the lack of work at the court provided them with the opportunity to meddle in each other's affairs."

The Judicial Tenure Commission said that assigning each of the judges away from Monroe County for six-month periods would enable them to fulfill their full-time judicial duties, would keep them busier than they are at their own court, and would hopefully reduce the time and energy that "they would have to perpetuate their feud."

In making this recommendation, the Judicial Tenure Commission, as fully or even more aware

[14] See part VII.

than Levitt and PAYANT, of the "discord" and
"turmoil" in the Monroe County Probate Court,
surely had concluded that Seitz had not, by
May 15, 1990, "demonstrated an attitude, a mind-
set, that [left it] firmly convinced that he is woe-
fully unfit for judicial office," or that he had
"exhibited a lack of the qualities from which
judicial temperament springs," or had "exhibited a
distinct pattern of injudicious temperament and
conduct."

Nothing occurred between May 15, 1990, and
the filing of the formal complaint but Seitz' al-
leged failure to "coöperate" with Leonard in mov-
ing his adoption docket and to be more responsive
to communications from Hall and her deputy,
Ferry.

This Court did not adopt the advice of the
tenure commission that one of the judges be as-
signed to visiting status away from his court for a
six-month period.

III

Before turning to the five specific charges found
by the majority to have demonstrated "a pattern
of gross judicial misconduct," I note that there
would be no need to publicize Costello's involve-
ment in the "discord" and "turmoil" or the unfor-
tunate events that occurred before the Judicial
Tenure Commission's letters of May 15, 1990, or to
advert to those letters but for the majority's por-
trayal of Seitz based in part on events that oc-
curred before May 15, 1990, and the Judicial Ten-
ure Commission's decision to reopen the incidents
—in several of which Costello played a role—that
preceded the post-May, 1990 specific charge of
"wilful neglect of adoption dockets and refusal to
respond to requests by the SCAO."

I would dispose of the other four incidents with a public censure or a brief suspension. The other four are:

—"unprofessional relationship with and hostile attitude toward employees."[15] Cameron terminated the unprofessional relationship in February, 1990, almost a year before the formal complaint was filed. Hall said in December, 1990, that "we had been successful in eliminating the public and private feuding which plagued the Court."

—"failure to file reports with the SCAO."[16] A report was filed in November, 1990, and the policy was to then "wipe the slate clean."[17]

—"installation of a telephone listening device" in 1988.[18] The majority asserts that it is not imposing discipline on this basis.

—"Abuse of contempt power" in 1989.[19] The Judicial Tenure Commission, in its letters of May 15, 1990, declined to file formal complaints based on this charge.[20]

IV

One of the five specific charges asserted "[u]nprofessional relationship with and hostile attitude toward employees."

A

The personal memo and cassette tape, which came to light when Cameron commenced an action

---

[15] See part IV.
[16] See part V.
[17] See text following n 25.
[18] See part VI.
[19] See part VII.
[20] See part II.

against Seitz and Monroe County,[21] set forth at some length by the majority, spoke disparagingly, with expletives and obscenities, about Costello, Harry Seitz, GILLIS, Hall and other SCAO personnel who had been assigned a supervisory role.

There is, however, no evidence that, outside the privacy of his personal relationship with Cameron, Seitz spoke disparagingly about them, either in his courtroom, or otherwise in public or in private, or that, either in his courtroom, or otherwise in public or in private, he spoke disparagingly of court employees, except *one* report that he spoke in derogatory terms to a court employee about other court employees.[22]

I agree with the majority that Seitz is subject to criticism and discipline for insisting, in the memo, that Cameron treat other court employees as adversaries, for demanding that she not attend a December, 1989, Christmas party scheduled by Costello, for threatening to discharge her if she did, and for the immoderate tone of his criticism, in the cassette tape, of Cameron's decision to marry Larry Cameron.

It does not appear that Cameron did, in fact, treat other court employees as adversaries.

B

The language of the private memo and cassette tape from Seitz to Cameron, replete with expletives and obscenities, was most unprofessional, inappropriate and unwise.[23] Theirs was indeed an unprofessional relationship. But it was a private,

---

[21] See n 12.

[22] Not, as claimed by the majority, that he used abusive language in speaking to that court employee about Costello.

[23] The majority quotes Seitz' reference to Cameron, in the cassette tape, as a "psychotic cunt." I believe it necessary to point out that the record shows that Cameron signed handwritten notes addressed to

personal relationship. There is no claim of sexual harassment.[24]

Theirs was a consensual relationship until Cameron decided to marry Larry Cameron. Seitz should have accepted her decision to marry him. Rather, he made and delivered to her the cassette tape, in February, 1990, expressing his distress, immoderately criticizing her decision, and expanding on the disparaging remarks set forth in his earlier memo of December, 1989.

C

Neither suspension nor removal is warranted because Seitz maintained a private, unprofessional personal relationship with his secretary.

Nor is suspension or removal warranted, on the basis that he evidenced, in private, personal communications, a hostile attitude toward court employees, *absent* misconduct in his courtroom or otherwise in public, or the repetition of such disparaging remarks at large. There is no evidence, nor did the master find, that Seitz translated the "hostile attitude" into actual abuse of court employees, either in public or in private. Misspeech in a private, personal relationship is not judicial misconduct.

V

Another specific charge is "failure to file reports

Seitz as "CLS/a/k/a PC," an abbreviation for psychotic cunt. She addressed him with initials that were similarly unprofessional.

[24] The majority quotes the master's statement that it would appear that Seitz was trying to create a sexual relationship with Cameron, and, as set forth in the majority opinion, Seitz gave Cameron inappropriate gifts. I believe it necessary to point out that the record also reflects that on one occasion, Cameron gave Seitz a hunk of chocolate candy formed to simulate a portion of the female anatomy, with a handwritten note suggesting that it might come in handy if a woman was unavailable over the weekend.

with the SCAO." Seitz failed to file with SCAO six reports required by the court rule to be filed every four months concerning undecided cases.

The record does not indicate that Seitz did, in fact, have a backlog of undecided cases within the meaning of the court rule.[25]

Levitt, Court Administrator for Region I, which included Monroe, testified that it was customary to treat a failure to file such reports as resolved once they are filed. He said: "It was a policy of our office to accept—to wipe the slate clean of previous —at least of the Region 1 office, to wipe the slate clean of previously-owed reports, if the reports indicated that there were no cases outstanding."

Hall testified that approximately five percent of the approximately six hundred trial judges fail to file this report timely.

There are no reported cases in Michigan concerning the imposition of discipline for the failure to file such reports. The majority cites a decision of the Iowa Supreme Court, *In re Carstensen,* 316 NW2d 889 (Iowa, 1981). There, the judge was suspended without pay for *twenty-nine days* for failure to timely file more than fifty reports, some of which, when filed, omitted cases that should have been reported.

---

[25] The court rule provides:

> Every trial judge shall, on the first business day of January, May, and September of each year, file with the state court administrator a certified statement in the form prescribed by the state court administrator, containing full information on any matter *submitted to the judge for decision more than 4 months earlier which remains undecided.* The judge shall also set forth in the statement the reason a matter remains undecided. For the purpose of this rule the time of submission is the time the last argument or presentation in the matter was made or the expiration of the time allowed for filing the last brief, as the case may be. If the judge has no cases to report, the word "none" on a signed report is required. [MCR 8.107. Emphasis added.]

Neither suspension nor removal of Seitz is warranted on this basis.[26]

## VI

Another specific charge is "installation of a telephone listening device" in 1988.

I agree with the majority that this Court would not be warranted in affirming the master's finding that Seitz had installed a telephone listening device in Cameron's home.

### A

I do not agree with the statement that "undisputed facts demonstrate Judge Seitz' embroilment in his employee's marital dispute, use of his own recording device to surreptitiously record conversations, and knowledge that his employee also intended to commit and had commenced what he believed to be a felony:"[27]

—While Seitz discussed with Cameron, when she was Paz, her marital dispute, there is no evidence that he became "embroiled" in that dispute, other than possibly as her confidant.

—While Seitz readily conceded that he surreptitiously recorded his own telephone conversations, that is not claimed to constitute an offense, and is not judicial misconduct.

—Nor does it constitute an offense or judi-

---

[26] Courts in other jurisdictions have similarly so concluded. *In re Long,* 244 Kan 719; 772 P2d 814 (1989), where the Supreme Court of Kansas imposed a public censure for failing to file reports of matters taken under advisement; *In re Alvino,* 100 NJ 92; 494 A2d 1014 (1985), where the judge had failed to timely and accurately file reports of undecided matters for eighteen years—no sanction was imposed because the rule had not been generally enforced.

[27] *Ante,* p 599.

cial misconduct that Seitz knew, if he did, that Cameron intended and had commenced to commit a felony.

B

Cameron testified that Seitz joined with her in installing a third-party listening device in her home, a felony. Rather than consider the evidence repeatedly offered by Seitz, which the master, the commission, and now this Court, refuse to admit into evidence, tending to impeach Cameron's credibility,[28] the majority states that it finds no need to decide whether to accept the master's finding adopting her testimony and finding that he did commit a felony.

Seitz disputed Cameron's testimony that he had purchased and installed a third-party telephone listening device for her. There is no evidence that Seitz aided, abetted, encouraged or otherwise assisted Cameron in committing a telephone listening device felony other than the testimonial dispute that the Court decides not to resolve. The Court, therefore, is obliged to proceed on the basis that Seitz did *not* aid or abet Cameron in committing a felony.

It is, again, not an offense or judicial misconduct

---

[28] See ns 8-10 of the majority opinion for the substance of this evidence.

Also noteworthy is that Cameron's husband, Darwin Paz, filed with the Judicial Tenure Commission, on the basis of statements made by Cameron, serious charges against two judges other than Seitz, which the Judicial Tenure Commission did not pursue presumably because it found them to lack credibility.

It is mystifying on what basis the Judicial Tenure Commission found Cameron to be credible in this one instance, especially in the face of the compelling exculpatory evidence referred to in ns 8-10 of the majority opinion, which the Commission and the master refused to consider.

Also, Cameron gave somewhat contradictory testimony on the telephone listening device issue in the federal court action she filed against Seitz and Monroe County.

that Seitz may have known, if he did, that Cameron intended to commit or had commenced to commit a felony unless he aided or abetted her in doing so.

C

The majority precedes its discussion of the "telephone listening device charge" with excerpts from the master's report concerning the relationship between Seitz and Cameron, stating that "[c]entral to an understanding of much of what transpired in the period during which the charges against respondent arose is his relationship with his secretary/court reporter."[29] (Emphasis added.)

The repeated focus on their relationship is not, however, "central to an understanding" of the charges, and tends rather to divert the reader from focus on the quality of the evidence claimed to support the several charges of misconduct, especially the telephone listening device charge.

D

The majority runs with the hare and hunts with the hounds in finding it unnecessary to resolve the testimonial dispute concerning the telephone listening device, in advancing other issues in lieu of the telephone listening device charge (embroilment in a marital dispute, surreptitiously recording his own conversations, and knowing that "his employee" intended to commit a felony), to which Seitz did not have an opportunity to respond before the Judicial Tenure Commission and to which this Court does not now provide Seitz an opportunity to respond, and in removing Seitz from the

[29] *Ante*, p 596.

bench, in part on the basis of these other issues,[30] without a new "recommendation" from the Judicial Tenure Commission.[31]

## VII

Another specific charge is "[a]buse of contempt power."

### A

Seitz was somewhat overbearing in the exercise of the contempt power, on May 9, 1989, against court employee, Daniel Gentner.

Seitz did not, however, abuse, in the sense of judicial misconduct, the contempt power.

The Judicial Tenure Commission reviewed this episode before writing Seitz and Costello on May 15, 1990, stating that this and other episodes did not justify the filing of formal complaints.

### B

The majority's discussion of this charge recounts the disagreement between Costello/Gillis and Seitz concerning whether all hearings concerning

[30] Following is the full text of the majority's statement:

> Although we might be inclined to honor the request for additional testimony were we to accept the finding of an act that would constitute a felony, we need not do so. The undisputed facts demonstrate Judge Seitz' embroilment in his employee's marital dispute, use of his own recording device to surreptitiously record conversations, and knowledge that his employee also intended to commit and had commenced what he believed to be a felony. Such actions, while individually not necessarily constituting a specific charge, support our conclusions regarding Judge Seitz' overall lack of judicial temperament and sense of propriety as developed in this opinion. [*Ante,* p 599.]

[31] See ns 57-58 and accompanying text.

persons *detained* in the youth center should be there conducted. This discussion is a backdrop to the conclusion—*not* that Seitz' order of May 5 actually subverted the administrative order issued first by GILLIS and reconfirmed by Costello requiring that all such hearings be conducted at the youth center—but that it was "designed" to do so. Parenthetically, after the power struggle over this issue abated, both judges held such hearings at the courthouse, and a formal memorandum was issued stating that further observance of the administrative order was voluntary.

C

The majority omits the portions of the administrative order, and of the May 5 order issued by Seitz, that are pertinent to Seitz' claim that he did not abuse the contempt power. Set forth in the margin is the full text of the administrative order[32] and of the order issued by Seitz;[33] the words em-

---

[32] The administrative order is set forth as follows:

*Effective immediately pursuant to MCR 8.110, the following policy shall be utilized in the handling of juvenile cases in Monroe County.*

*In all delinquency cases within the jurisdiction of the Monroe County Probate Court, Juvenile Division, any juvenile offender who is detained at the Monroe County Youth Center, or a resident of the Residential Treatment Program, shall not be transported to the Courthouse for any hearing, excluding trial.* All hearings will be conducted in the hearing room of the Monroe County Youth Center by the judge assigned to the case by blind draw.

*All preliminary hearings and informal matters will continue to be heard by a referee as assigned by the judge reflected as being the presiding judge over the specific case.* All formal hearings, including dispositional hearings, *pre-trials, show-cause petition hearings, and review hearings,* will be conducted by the judge of record for the matter as assigned by blind draw. [Emphasis added.]

[33] Seitz' order is set forth as follows:

phasized were omitted in the majority's recitation.

The administrative order and the May 5 order, *read without the omitted language* set forth in the margin, support the majority's conclusion that Seitz' May 5 order violated the administrative order. *Read without the omitted language,* the administrative order required that all dispositional hearings be conducted at the youth center, and Seitz' May 5 order set a dispositional hearing at the Monroe County courthouse.

The language omitted from the administrative order, states, however that the administrative order applies only to "any juvenile offender who is *detained* at the Monroe County youth center, or a *resident* of the Residential Treatment Program." Seitz' May 5 order directed Gentner, Superintendent of the Youth Center, to *release* Jane to her father's custody at any time after 9:00 A.M. on May 10, over five hours before the 2:45 P.M. hearing scheduled at the Monroe County courthouse.

Seitz testified without dispute that he and other Monroe probate judges frequently released children from the youth center *without a dispositional hearing.* Seitz' order to *release* Jane to her father was a perfectly valid order, not violative of the

---

The Court having received the recommendations of the pre-dispositional assessment conducted at the Monroe County Youth Center, and those recommendations being that Jane be released to her father, now therefore:

IT IS ORDERED, that this matter be and is hereby scheduled for a dispositional hearing on: Wednesday, May 10, 1989 at 2:45 P.M. in Courtroom #305 of the Monroe County Courthouse.

*IT IS ORDERED, that Daniel Gentner, Superintendent of the Monroe County Youth Center, shall release Jane to her father's custody at any time after 9:00 A.M. on Wednesday, May 10, 1989.*

*IT IS FURTHER ORDERED, that failure to comply with any provision of this order shall be deemed contempt of this Court.* [Emphasis added.]

administrative order. Seitz had already concluded, as intimated in the May 5 order, that he intended to release Jane from custody on probation pursuant to the recommendation set forth in the predispositional assessment. Having made that decision, he was justified in ordering her released from custody to her father before a dispositional hearing.

The purpose of the administrative order was to avoid transporting to and from the courthouse residents of the youth center who would continue to be detained in custody. Seitz' order directing that Jane be released to her father five hours before the dispositional hearing did not conflict with the spirit of the administrative order in the circumstance that she would not be retained in custody after the dispositional hearing.

It would be perfectly clear that Seitz' directive that Jane be released to her father was not violative of the administrative order if Seitz had issued two orders: one directing that Jane be released on, say, May 9 to her father, and another directing that she appear on May 10 or even May 20 for a dispositional hearing, at which the conditions of her probation could be impressed upon her.

D

The record of the contempt hearing does not support the claim that Seitz "conducted a 'mock' hearing devoid of due process."[34] Seitz was courteous, but firm. That cannot be said of many records in countless other cases that this Court has examined without requesting Judicial Tenure Commission action.

Seitz should, I agree, have allowed Gentner to consult counsel when he asked to be provided an

[34] *Ante,* p 601.

opportunity to do so. The majority decides that an
opportunity to consult counsel is required before
the court proceeds with a hearing where civil
contempt is charged. *Mead v Batchlor,* 435 Mich
480; 460 NW2d 493 (1990), was decided over a year
after Gentner was found to have committed civil
contempt. Before that case was decided, *Sword v
Sword,* 399 Mich 367; 249 NW2d 88 (1976), was the
last expression by this Court.[35]

Circuit judges often detain husbands/fathers or
find them to be in civil contempt for failing to pay
alimony and child support with less formality than
one sees on the record in the instant case.

Gentner obtained counsel, who appeared in the
afternoon, and was released from custody late in
the afternoon. Seitz found that he was "purged of
contempt. Not by his own doing, but by operation
of the law [when Jane was released in compliance
with the order]. And order that any—if—if—if
that is legally admissible, order that the references
to his arrest be deleted."

### E

Costello had directed Gentner not to comply
with Seitz' order. The majority apparently is of the
view that Costello, as chief judge, could reverse
Seitz' order; it states that "the facts amply support
the conclusion that Judge Seitz was intent upon
subverting the rules of his court and the *decisions
of his chief judge* with which he disagreed . . . ."[36]

A chief judge does not have the authority to
countermand an order of another judge not viola-

---

[35] While *Sword* concerned the question whether appointed counsel
was constitutionally required for indigent husbands/fathers who fail
to make support payments, it had implications on the question of
what constitutes due process in a civil proceeding to enforce a court's
order. *Id.,* p 387.

[36] *Ante,* p 604.

tive of an administrative order. Seitz' order was not violative of the administrative order insofar as it directed that Jane be released to her father. In all events, the question was at least arguable. Costello, who had no reluctance to communicate with SCAO or the Judicial Tenure Commission concerning Seitz, could have taken his "appeal" thereto. There was no justification for Costello's directive to Gentner that he should not comply with Seitz' order.

Seitz stated at the contempt hearing that, during the day, he had communicated with the SCAO (but did not state with whom), "who advised this Court that other judges of the Court had absolutely no business whatsoever in interfering with this Court's disposition of a case that was assigned to this Court." I agree.

F

It is *not claimed that on any other occasion* Seitz violated the administrative order.

It is again noteworthy that before Hall urgently requested, on December 11, that the Judicial Tenure Commission investigate Seitz, the commission had decided not to file formal complaints concerning a number of charges, including charges against Seitz and Costello respecting the Gentner contempt episode, absent a recurrence of "further episodes of this nature" or a "repetition of such conduct," and that Hall, in her letter of December 11, said, in effect, that there had not been a recurrence of further episodes of this nature or a repetition of such conduct. The commission has not explained the basis on which it later concluded that Seitz' conduct in the Gentner matter deserves "the severest sanction." See *In re Hague,* 412 Mich 532, 554-555; 315 NW2d 524 (1982).

Judge Hague was suspended for *sixty days* for
disobeying valid orders entered by superior courts,
refusing to follow decisions of higher courts, abus-
ing his contempt powers, improperly excluding
attorneys from practicing in his courtroom, and
engaging in a war with local prosecutors that led
him to ignore the limits of his judicial authority
and the obligations imposed upon his office.

### VIII

The remaining specific charge is "wilful neglect
of adoption docket and refusal to respond to re-
quests by the SCAO."

The only charge of misconduct, as distinguished
from misspeech in a private, personal relationship,
that has substance, relates to Seitz' failure to
"coöperate" with Leonard in moving his adoption
docket and to respond to requests from the SCAO.

When Cameron left the employ of the Monroe
County Probate Court in February 1990, Irene
Leonard, another court employee, took over Cam-
eron's task of preparing adoption cases for hear-
ing.[37]

Leonard had been the adoption *investigator* for
both judges, but had no training or experience in
preparing files for hearings. She studied the adop-
tion code, reviewed old files, but was provided no
assistance.

### A

When Cameron was Seitz' secretary/recorder,
there were no problems with the adoption docket.

---

[37] The master added "[a]nd, parenthetically, it appears to be typical
of Judge Costello that when he found that Mrs. Leonard was doing
this for respondent, he directed Mr. Pace [Monroe County Probate
Court Director] to order Mrs. Leonard to do the same work for him."

Nor was there any problem between February and May, 1990.

Leonard testified that when Seitz returned from an April vacation, he avoided her, made himself inaccessible, and would not respond to her requests that he set hearing dates. The majority appears to have adopted Leonard's explanation that Seitz was retaliating because she stood up at Cameron's wedding.[38] The master said that this claim was not substantiated.[39] Seitz' explanation for avoiding Leonard was that she was not competent.

In September, 1987, when Seitz was chief judge, he issued a "chain of command" administrative order that prohibited the judges from communicating directly with court personnel concerning their job performance and required that all such communications be sent to Pace, the court director (court administrator). Subsequently, after Costello became chief judge in 1989, he reaffirmed the chain of command order.

Seitz said that by reason of the chain of command order he could not tell Leonard what had to be done or how to do it. The master said that in fairness to Seitz "it should be noted that Judge Costello had made frequent complaints" that Seitz had violated the chain of command order. By May 15, Seitz was under the strictures of the Judicial Tenure Commission's injunction to avoid "further episodes of this nature" and "any repetition of such conduct" or face formal action.

B

On June 29, 1990, Seitz transmitted a memo to Pace stating that Leonard had problems with the

[38] *Ante,* p 612.
[39] See n 48.

adoption hearing job and lacked training for it. Pace testified that he was not qualified to train Leonard.

Seitz expressed to Levitt, who reported directly to Hall, his view that Leonard was not competent.[40] In September, Seitz expressed to Greg Ulrich, an assistant Regional State Court Administrator, his dissatisfaction with Leonard's work.

The master said: "Incredibly, then, no one met the responsibility of seeing that Mrs. Leonard was *trained or performed* her duties correctly." (Emphasis added.)

By letter dated November 9, 1990, addressed to Hall, Seitz expressed at some length the view that Leonard's work in adoption cases was deficient. A copy of that letter is attached as Appendix A.

Hall did not respond to Seitz' letter. Nor did she make a determination concerning Leonard's competence. It appears, rather, that she acted in reliance on Levitt and Ulrich, who, like Pace, disclaimed knowledge of adoption procedures and expertise, and who merely forwarded Leonard's views of when cases were ready.

C

The master found that "considerable animosity" developed between Seitz and Leonard. While it "may" have stemmed in part from Leonard's relationship with Cameron, it "may" have stemmed in part from a May 4, 1990, hearing. One of two putative fathers had not been served with a notice of hearing, and perhaps none had been attempted. Seitz claimed that Leonard lied under oath when

[40] The master said that Levitt met with Seitz at some point to discuss pending adoption cases "obviously triggered by Mrs. Leonard's complaints." Seitz advised Levitt that Leonard was not preparing files properly.

she said that the father had been served. The master said: "Rightly or wrongly, it is clear that thereafter [Seitz] had no further patience with Mrs. Leonard and generally avoided her."

D

The master continued that while Seitz did not respond to Leonard's request to set hearing dates, "[a]doption proceedings did not grind to a complete halt." Before Seitz left on vacation in July, 1990, he gave Leonard dates for hearings in a number of cases. He began keeping files in his office to which Leonard had no access. Seitz set hearing dates and signed orders in cases of which Leonard had no knowledge.

The master found that, "[f]or whatever reason, Mrs. Leonard carried a grudge against the respondent," and complained to Pace. Through Pace, or on her own initiative, Leonard obtained the ear of Region I Court Administrator Levitt.

E

Levitt and Ulrich came to Monroe on June 19 to discuss other problems. Leonard asked Pace to arrange for her to meet with Levitt. She presented a list of adoption cases that "she felt were being neglected" by Seitz. Levitt forwarded her complaints to Hall. The list was forwarded, said the master, without consulting Seitz or seeking his "input" or "views."

On July 12, 1990, Hall wrote Seitz stating that "[a]doption files that *in the past were routinely and expeditiously disposed of in your courtroom* are now experiencing delay according to reports

reaching this office." Five cases were listed. The letter continued that "[w]hat may be objectionable is that you apparently refuse to discuss [one of the five cases] or give direction to a *veteran court employee* who has attempted several times to discuss this with you."[41] Seitz' "earliest attention" was sought to the five cases, and Hall expressed the *"wish"* to be notified weekly as to what progress and dispositions Seitz had made.

Hall testified that she telephoned Seitz weekly during the summer, and that Seitz did not return her calls. Seitz testified that he did not learn of the calls and that there was no record of any messages from Hall.[42] The master found that Seitz did not return Hall's calls. He did not find that Seitz had received any message that Hall had called.

The master found that Seitz ignored the letter from Hall dated July 12. He said that Seitz' reaction "while not excusable, is understandable. The Administrator was listening to an employee that he considered to be incompetent but was paying no attention to him. He felt aggrieved."

Levitt and Ulrich continued to monitor events in the Monroe County Probate Court. On August 31, 1990, Levitt sent a memo to Hall stating that

---

[41] Leonard may have been a veteran investigator, but was not a veteran at preparing files for hearing.

[42] Seitz testified that he received no calls at home, and that his private line rang only in his office and not on the bench.

Seitz had a secretary in his office only intermittently.

At the trial, Hall was not asked to particularize whether she called Seitz on the private line or public line in his office, or through the court's central switchboard, or with whom she may have left messages for Seitz. It appears that Hall may have tried to reach him through Pace, and that when she did so, he responded that the judge was not available. Pace was not asked whether he had received calls from Hall for Seitz, and, if so, whether he had given Seitz any message.

"Judge Seitz had made satisfactory progress on a list of cases you earlier called to his attention."[43]

## IX

On September 12, Hall wrote the tenure commission requesting an investigation of Seitz' conduct. The letter said that

—Cameron claimed that Seitz had installed an electronic eavesdropping device in a jury room in his chambers;

—Seitz had failed to file, in January and May, 1990, reports of undecided cases as required by MCR 8.107;

—Seitz had failed to report on the status of adoption cases weekly;

—There had been delay in the disposition of Seitz' adoption docket.

Electronic surveillance of the jury room was not charged in the formal complaint filed by the Judicial Tenure Commission.

Seitz filed a report of undecided cases in November, 1990.

The delays in Seitz' adoption docket referred to in Hall's letter of July 12 appear to have been resolved by August 31, before Hall wrote the tenure commission on September 12. Hall had, indeed, received further complaints from Leonard, the merits of which had not, however, been sub-

---

[43] The master said that "[i]f there was any hope of things improving between Mrs. Leonard and [Seitz], it was probably dashed on August 3rd when no one appeared at a hearing" that Seitz had scheduled at Leonard's request. Leonard had relied on the assurance of one of the petitioners that all the parties would appear voluntarily, and did not give anyone notice. The master viewed that as innocuous, but Seitz viewed it as "inexcusable."

jected to scrutiny by a person qualified to make an assessment.

## X

The master said that nothing eventful occurred in adoption cases during the two-month period between August 31 and October 31. Leonard continued, however, to complain to Hall, and provided a list of cases that, in her opinion, had been neglected.

## A

By letter dated October 31, 1990, Hall provided Seitz with a list of seventeen cases and asked that he advise her by November 9 at the latest the dates these cases would be heard or why they could not be scheduled for hearing or other action.

Seitz responded by unsigned letter dated November 9 (Appendix A), which was not received until November 14. The letter did not respond directly to Hall's request that he set hearing dates.

Seitz wrote at length stating why he was not responsible for any delay. He said that the solution was no longer under his authority or control. He said that formerly hearing dates were generally set within fourteen days, and claimed contested hearings proceed faster on his docket than on the dockets of most other probate judges.

Seitz attributed any delay to his concern that the case be fully and properly prepared when litigants appear on a hearing date; persons who take off time from work to come to his courtroom for a hearing should not have to return another day because all the necessary paperwork had not been completed because of the "laziness and/or ineptitude of a Court employee."

Seitz said that before Cameron left, everything moved expeditiously. After Cameron left, cases prepared by Leonard could not be completed on the hearing date because they had not been properly prepared. Seitz had repeatedly advised Pace and his assistant that Leonard did not know what she was doing.

Seitz concluded:

> I'm returning all the pending adoption files to the Court Administrator [Pace]. I would suggest that he review each of the cases, and make sure that in each case, the file is complete and ready for hearing, the Adoption Supervisor had completed a proper investigation and spoken to all the parties involved, and that she has advised the parties of what information they will have to have at the hearing, and that the proper notices have been given to the parties (at the right addresses).
>
> *When I receive a certification from him that this has been done, the case will be set within fourteen days.* [Emphasis added.]

### B

On November 16, less than thirty-six hours after Hall received Seitz' November 9 response, Ulrich was directed to return to Monroe and set an adoption docket for Seitz, who was out of the city. A secretary checked Seitz' calendar and concluded that January 8 was an open date. Leonard provided Ulrich with a list of files which was faxed to Deputy Court Administrator John Ferry who, that day, within thirty-six hours of the SCAO's receipt of the letter dated November 9, wrote Seitz scheduling nine cases for hearing on January 8, referring two cases to a referee and directing that Seitz, no later than December 3, should *decide motions for confirmation or sign an order* in seven cases with

nine docket numbers, which Ferry said did not require a hearing.[44]

The master found that all open files were reviewed on November 16 by Ulrich and Pace with Leonard. Pace and Ulrich disclaimed, however, any knowledge of the procedures or expertise. Similarly, Ferry disclaimed knowledge or expertise. It is apparent that all three acted largely on the advice of Leonard.[45]

C

Seitz did not enter the orders by December 3. When Ferry's November 16 letter arrived, Seitz was in Florida attending a judicial seminar. He returned to work Friday, November 23, the day after Thanksgiving. This left the week of November 26, and December 3 itself, six or seven business days.

On December 3, Seitz met with James Carr, a friend and former law professor, who then was a Magistrate in the United States District Court in Toledo. Carr testified that he advised Seitz that he should treat the communications "as though somebody is out to get you."

Clearly, Seitz should have responded, at least by telephone, by December 3 or immediately upon receipt of Ferry's follow-up letter of December 4 requesting information concerning the status of the seven cases.

Seitz was no doubt at fault in failing to be more responsive to communications from Hall and Ferry, and in failing to find a way to reach an accommodation satisfactory to them.

Seitz could and should have scheduled a number

---

[44] Leonard, during the summer, had requested that hearings be set in some of these cases.

[45] At one point they consulted with Costello's secretary.

of cases for hearing. Hall should have undertaken an inquiry concerning Leonard's competence, and attempted to make satisfactory alternative arrangements during the pendency of the inquiry. Seitz was entitled to a careful evaluation and a written response to his repeated complaints about Leonard's work performance and to his letter dated November 9. He never was provided such a response.

In fairness to Hall and also to Seitz, the scope of Hall's authority and responsibility under the order appointing her Special Court Administrator for the Monroe County Probate Court was far from clear. This Court's order appointing her was deliberately vague in that regard.[46]

It has not been claimed or determined by the SCAO, the Judicial Tenure Commission, the master, or this Court, that Seitz' complaints about Leonard's work performance were unfounded and lacking in merit. No judge or other person familiar with the day-to-day work of a probate court in adoption cases was called to testify concerning either Leonard's or Seitz' work performance. Yet, Seitz is removed from office, at least in part, possibly largely, because of his discourtesy to Hall and her deputy Ferry, and claimed defiance in failing to be more responsive to communications and directives from Hall and Ferry concerning

[46] This Court entered an administrative order on June 9, 1989, reading as follows:

To insure the effective and efficient administration of judicial business in the Monroe County Probate Court, the Court appoints State Court Administrator Marilyn K. Hall as Special Administrator of the Monroe County Probate Court, until further order. As Special Administrator, Ms Hall is the administrative director of that court.

The State Court Administrator is directed to submit a report to the Court regarding the condition of the Monroe County Probate Court by December 1, 1989.

adoption cases—communications and directives which ignored his repeatedly expressed concerns about Leonard's work performance.

XI

Seven days after Ferry's follow-up letter of December 4, on December 11, Hall filed with the Judicial Tenure Commission a six-page request for investigation of Seitz. She acknowledged that his MCR 8.107 report concerning undecided cases, due in September, 1990, had been filed on November 26.[47]

Hall attached copies of Seitz' letter of November 9 and her letter of November 16, adding that "[t]o date we have received no word regarding this group of cases."

Cameron had filed an action in the United States District Court on November 21, 1990, and had provided the news media and Hall with copies of the graphic personal memo and cassette tape. Hall quoted therefrom and also attached a copy of an article that appeared in the Detroit News on November 21.

Hall also enclosed a copy of the complaint filed by Cameron in which Cameron claimed that Seitz had invited her to go out with him on his boat, run off with him to California, travel with her son to Florida at the same time he was vacationing there with his family, told Cameron's sister that Cameron was making a big mistake and that he would kill Cameron's husband, Larry Cameron, if he hurt Cameron.

The complaint also alleged that Seitz had since barred Larry Cameron, a court employee, from his courtroom and refused to recognize his recommen-

---

[47] She added that the reports for January and May were never filed.

dations concerning juvenile placement. The master found that the allegations concerning Larry Cameron were unpersuasive: "The charges are conjecture . . . plausible but not substantiated by any evidence."[48]

Hall said that Seitz had "consistently refused to coöperate on administrative matters and his behavior continues to seriously erode the ability of the court to operate effectively, efficiently, and fairly."

Hall expressed the opinion that if Seitz were to continue to fail to "coöperate in administrative matters," that would "negatively affect the rights of parties who come before the court . . . ." In order to "correct the situation," Hall said that it was "*imperative* that the Judicial Tenure Commission act as *swiftly* (emphasis in original) as possible to fully investigate this matter and take appropriate *action*." (Emphasis added.)

It is clear that decisions were being made at the highest level of the judicial system to move against Seitz, at least in part because he did not "coöperate" with Leonard. Seitz sensed this, and events were to bear out that impression.

A

The letter to the tenure commission was dis-

―――――――――――――――

[48] The master said:

Paragraph 14 charges that respondent in effect *boycotted Mrs. Leonard* and criticized her work without cause because he discovered that she had been maid of honor at the wedding of Mrs. Cameron, and that he banished youth home employees from his court and *barred Larry Cameron from doing intake work* on his cases because he was conducting a vendetta against his former secretary and her new husband. *The charges are conjecture . . . plausible but not substantiated by any evidence.* [Emphasis added.]

patched Tuesday, December 11. The following day, December 12, Seitz held pretrial conferences in two juvenile delinquency matters. The cases were to be dismissed by the prosecuting attorney but, to facilitate efforts at collecting restitution, Seitz listed the cases for trial on January 8 at 8:30 A.M., before the adoption docket was to commence at 9:00 A.M.

The master said that either Leonard or Pace learned of the additional cases scheduled for January 8, "and, without consulting with respondent [Seitz], leaped to the conclusion that this meant that respondent was going to ignore the adoption cases scheduled for Jan. 8th. This belief was obviously communicated to the [State Court Administrative Office] for, on Dec. 13, a copy of respondent's Jan. 8th docket was faxed from Pace's office to the SCAO."

Hall testified that when she learned additional cases were scheduled for January 8, she became "upset." The next day, December 14, pursuant to Hall's instructions, an order was entered assigning Probate Judge Kirkendall of Washtenaw County to be a Monroe County Probate Court judge to "assist with docket" in nineteen adoption cases identified in the order of assignment. Hall had previously arranged for Judge Kirkendall to be available. The stated reason for the assignment was "delay due to paperwork."

Also on December 14, Levitt and Ulrich were dispatched to Monroe to pick up the files in the adoption cases. Seitz told Levitt and Ulrich that the files were not at his office, but at his attorney's office. The files were actually in Seitz' office. Seitz testified that he wished to make photocopies before turning them over to the State Court Administrator. The files were not turned over to Ulrich until Monday, December 17.

B

When Levitt and Ulrich were in Monroe to pick up the files on December 14, *Seitz advised them that he would be able to take care of the cases on January 8.* They, nevertheless, insisted that the files be turned over to them.

Ulrich acknowledged that when, on November 16, he set January 8 as the date for hearing those cases, *he told Seitz' secretary that other matters could be scheduled for that day.*

When January 8 arrived, Seitz heard the two delinquency matters before 9:00 A.M. He was available and could have heard the adoption cases scheduled for that date.

The master found that "the SCAO handling of the assignment of Judge Kirkendall for the Jan. 8, 1991 hearings leaves something to be desired," and that the record *"does not establish a refusal to handle the cases on Jan. 8th."*[49] (Emphasis added.)

[49] The master found:

On Dec. 14 the following events transpired, though not necessarily in the order listed:

(1) Administrator Hall approved sending a[n] outside judge to hear the adoption cases on a standby basis; her thought was that if respondent was there to hear the cases, the assignment would be cancelled; or, if respondent made it clear that he would hear the cases, she would cancel the assignment.

(2) Judge John Kirkendall of Washtenaw County was, or already had been, contacted for possible assignment to serve on Jan. 8th.

(3) Ferry sent Levitt and Ulrich to Monroe to check on the January 8th cases. They were instructed to pick up the files of the Jan. 8th cases for delivery to Judge Kirkendall.

(4) Ulrich understood that the decision had already been made to assign Judge Kirkendall to hear that [sic] cases; that they were no longer respondent's cases to hear.

(5) Initially, Levitt did not discuss the apparent scheduling conflict with respondent. He reported by phone to Ferry that, from talking to staff, it appeared that one of the juvenile cases could take a substantial length of time. Ferry testified that he instructed Levitt to check with respondent on the apparent

XII

While the master found that Seitz had failed to "move the [adoption] cases," the length of the delay in particular cases is unclear. The cases generally had been filed less than six months before.

Seitz had concluded, on the basis of claimed errors and omissions by Leonard, that he could not

> conflict, and that Levitt called back to say that respondent said that there would be no problem (sic, with handling the adoption cases). Ulrich confirmed that respondent indicated that there would be no problem ("he said the juvenile matters would not take long"), but said that he took the scheduling of the juvenile cases by respondent as an indication that he did not intend to hear the adoption cases. Ulrich also conceded that when he set the adoption cases with respondent's secretary, he told her that other matters could be scheduled that day.
>
> (6) When Levitt and Ulrich sought to obtain the files for the Jan. 8th adoption hearings, respondent told them they were not available but were at his attorneys' and could be obtained on Monday, the 17th. The files were in fact in respondent's office; he testified that he had become paranoid about the SCAO and that he was keeping the files to copy so that no changes could be made in them.
>
> (7) Despite respondent's statement to Levitt that there would be "no problem" with the adoption cases, Ferry decided to assign Judge Kirkendall anyway, in part because of respondent's statement that his attorney had the files.
>
> (8) The Administrator made a formal assignment of Judge Kirkendall to hear the listed cases on Jan. 8.

The master also said:

> The scheduling of two juvenile matters for the same time may have seemed to be in apparent disregard of the adoption hearings which the SCAO had set for the same day, but *no inquiry was made of respondent as to whether he intended to handle the January 8 hearings, there was nothing in the SCAO letter of Nov. 16 which required a response from respondent on that point, and his statement that there would in fact be no conflict on that date was disregarded.* Had the SCAO, from all of the circumstances of respondents failures to move the cases and to respond to SCAO letters, simply made an assignment of a visiting judge, that certainly would have been justified. On this record, it is clear that respondent had theretofore failed to perform his judicial duties in handling those cases.

rely on her to prepare the files with care. Seitz
was unwilling to set cases for hearing unless some-
one in the court, who was competent to do so,
certified that the files were in order for hearing.
He had so advised Pace, Hall, Levitt, and Ulrich.

It appears further that Leonard was not trained
and no effort was made by Pace or scao to provide
her with the requisite training. And, before direct-
ing Seitz regarding the performance of his office,
no effort was made to determine whether Leonard
was performing her duties correctly. None of the
persons who examined the files at Hall's direction,
Levitt, Ulrich, or Ferry, had knowledge of proce-
dures or expertise. Seitz was, nevertheless, di-
rected, on the basis of Leonard's advice that the
files were in order, to enter orders, decide motions,
and set cases for hearing.

Noteworthy in this connection is that the master
found that "Leonard carried a grudge against"
Seitz. The master also found that the *charge that
Seitz "criticized her work without cause" was "not
substantiated by any evidence."* (Emphasis added.)

The Judicial Tenure Commission and the major-
ity find misconduct because Seitz failed to "coöper-
ate" and work with a "veteran employee," al-
though, as the master put it, "no one met the
responsibility of seeing that Mrs. Leonard was
trained or performed her duties correctly."

A

As to the cases set for hearing on January 8, I
repeat that the master found that the record "does
not establish a refusal to handle the cases on
Jan. 8th."

B

Turning to the cases that Ferry directed Seitz to
decide by order on or before December 3, one had

already been decided, and a hearing had been
scheduled in another in August.[50] This left five
motions for confirmation of adoptions that Seitz
was directed by Ferry to decide by order *without a
hearing* on or before December 3.

While Seitz might possibly have been remiss in
not setting one or more of the five motions for
confirmation for hearing sometime in October to
December—but no one qualified to express such an
opinion gave evidence—Seitz was clearly justified
in refraining from acting on motions for confirma-
tion without a hearing. He might, following such a
hearing, have even been justified in delaying con-
firmation of adoption well beyond December 3 or
January 8, depending on his good-faith assessment
of the "best interests" of the child.

The statute provides that one year after the
entry of an order terminating parental rights, the
court *may* enter an order of adoption and that
upon motion (a motion for confirmation) "the court
*may* waive" the one-year period if the waiver is in
the best interests of the adoptee, or extend the
one-year period.[51]

The majority does not explain, nor has the
tenure commission, on what basis Seitz can be
disciplined for not having entered orders on or
before December 3 confirming the adoptions when,
under the statute, he is required to make a *judi-
cial* determination of the best interests of the child
and might have been justified in delaying confir-
mation for an additional six months or an addi-
tional year.

C

I do not, accordingly, agree that Seitz *wilfully*
neglected the adoption cases. There was some

---

[50] The status of this matter at the time is unclear.

[51] MCL 710.56; MSA 27.3178(555.56).

delay,[52] and a bigger and wiser person would have found a way to "coöperate" and work with·Leonard and Hall. Seitz' failure to coöperate and work with Leonard and Hall, and the resulting delay, might possibly warrant the imposition of a suspension, but certainly does not warrant removal.

### XIII

The majority states: "As we examine the *expressions* of Judge Seitz, it *conjures up specific impressions* of belligerence, vindictiveness, hostility, bitterness, disrespectfulness, and considerable perversity of will and motive. These characteristics reso-. nate discordantly when compared with the Code of Judicial Conduct . . . ."[53] (Emphasis added.) But Seitz cannot properly be removed from office because of "expressions" that "conjure up specific impressions," or because he is viewed as unpleasant. Unless the conjured-up impressions of unpleasant personal characteristics manifest themselves in misconduct in the courtroom or in public, discipline may not properly be imposed.

### A

The only instance of misconduct *claimed* to have constituted abuse of a person in or out of court was the charge that Seitz abused his contempt power in respect to Gentner.[54] During oral argument, the lawyer for the Judicial Tenure Commission acknowledged that there was no evidence that Seitz' "attitude" was directly reflected in any of

[52] It does appear that, on review of the files, apparently in retrospect, orders could have been entered in some of the cases and hearings could have been scheduled because the cases were indeed problem free, or the problems, such as they were, manageable.

[53] *Ante,* p 626.

[54] See part VII.

the court cases before him, and that the Gentner contempt case was the only incident charged where it was claimed that there was an abuse of judicial authority.

Seitz was not otherwise found to have abused, in court or out of court, any litigant, lawyer or other person.

B

The delays in the adoption docket consist of less than ten cases. The length of the delay has not been quantified, but it is clearly less than two months. Hall did not evaluate the files. Nor did Ferry. Nor did Ulrich. Nor did Levitt. Nor did Pace.

*It is not claimed that Seitz delayed any other part of his docket, in estate or mental incompetency cases, or otherwise.*

C

While Seitz' idiom was lurid in private, his conduct pales almost into insignificance in comparison to the conduct of judges who have, in a number of cases, abused litigants and lawyers in the courtroom, neglected, over an extended period of time—sometimes years—their dockets, who have been merely admonished or privately censured (see Appendix B) or, on a few occasions, in especially egregious cases, subjected to suspensions of a year or more.

In *In re Bennett,* 403 Mich 178; 267 NW2d 914 (1978), this Court suspended a judge from office for one year without pay on findings that he knowingly and *wilfully violated an order of superintending control* that visiting judges were to make determinations of indigency and appointments of

counsel in criminal cases in the district court, that he regularly employed a variety of common obscenities and profane expressions in dealing with various persons *on the bench* and while conducting court business, that he improperly participated in the partisan political campaign of a candidate seeking election to the state House of Representatives and engaged in mudslinging, that he unilaterally and summarily terminated a contract with a law firm providing public defender services to indigent criminal defendants, and that he entered the County Register of Deeds office after hours without authorization, through exertion of his authority as a judge.

### D

I do not wish to be understood as saying that the Judicial Tenure Commission is bound by the precedents of the levels of discipline recommended and imposed in the past. But there is no evidence that the Judicial Tenure Commission has decided to increase the level of discipline generally.

The recommendations of the Judicial Tenure Commission in the instant case are not evidence that it has raised the level of its recommendation generally because one of the findings of misconduct is the finding that Seitz committed a felony, a finding that the majority does not adopt.

### E

Judges have generally been removed from office in Michigan only for criminal conduct.[55] The disci-

---

[55] *In re Leon Jenkins,* 437 Mich 15; 465 NW2d 317 (1991); *In re O'Brien,* 430 Mich 323; 422 NW2d 685 (1988); *In re Loyd,* 424 Mich 514; 384 NW2d 9 (1986); *In re Callanan,* 419 Mich 376; 355 NW2d 69 (1984).

pline imposed in other jurisdictions for a failure to move a docket has not been either lengthy suspension or removal.[56]

F

It is manifest from the discipline recommended by the commission in other cases—see Appendix B —that, at least judging from past recommendations, the commission could not, consistent with past recommendations, have recommended removal for the offenses that it found Seitz had

---

But see *In re Ryman,* 394 Mich 637; 232 NW2d 178 (1975); *In re Heideman,* 387 Mich 630; 198 NW2d 291 (1972).

[56] *In re Long,* 244 Kan 719; 772 P2d 814 (1989), the judge took between eight and thirty-one months to decide some cases, in addition to other, similar acts of misconduct. The Kansas Supreme Court publicly censured Judge Long.

*In re Kirby,* 354 NW2d 410 (Minn, 1984), the judge was disciplined in part for being late to his own court twenty percent of the time, causing numerous adjournments. He was publicly censured.

*In re Steinle,* 653 SW2d 201 (Mo, 1983), the judge was suspended for two weeks for dilatoriness in rendering judgment in thirteen cases.

*In re Anderson,* 252 NW2d 592 (Minn, 1977), the judge was suspended for three months, in part for delaying judgment in twelve cases for more than ninety days. One of those cases had been taken under advisement in 1969.

*In re King,* 399 SE2d 888 (W Va, 1990), a family law master took over nine months to render a decision on a motion for increase in child support. When questioned by the litigants, he misrepresented that the decision had been issued. The petitioner in the matter lost additional wages as a consequence of having to attend additional hearings, and was deprived of a fair child support payment for nine months. The master was censured.

*In re Kohn,* 568 SW2d 255 (Mo, 1978), the judge took over four years to decide one case, and twenty-one months to decide another. The judge was censured.

*Judicial Qualifications Comm v Cieminski,* 326 NW2d 883 (ND, 1982) reports a story of a judge who had inactive cases on his docket since 1975. In addition, a number of small claims matters were pending beyond the statutory limit, and several cases submitted for decision over one year before were still undecided. The judge was suspended for three months without pay, and ordered to consult on a regular basis with the state court administrator concerning his docket upon his return to the bench.

Numerous other cases reflect that delay has not been thought to be sufficiently egregious to warrant removal.

committed, other than the finding respecting the telephone listening device, which the majority correctly declines to adopt.

The constitution provides that this Court is empowered to impose discipline on the "recommendation" of the Judicial Tenure Commission.[57] This Court has declined to impose discipline greater than that recommended by the commission in cases where a majority was of the opinion that greater discipline should be imposed.[58]

The discipline recommended and imposed is so disproportionate compared to the misconduct—absent a finding, adopted by this Court, that Seitz committed a felony or aided and abetted the commission of a felony—that the cause should be remanded to the Judicial Tenure Commission for a new recommendation of discipline on the assumption that Seitz did not commit a felony.

APPENDIX A

November 9, 1990

Ms. Marilyn K. Hall
State Court Administrator
P.O. Box 30048
Lansing, MI 48909

Dear Ms. Hall:

In response to your October 31, 1990 letter, I'd first indicate that I'm well aware of the Legisla-

[57] See n 1.

[58] The majority of this Court has refused to enter private censures in cases where the majority was of the opinion that the recommended discipline was inadequate, and has remanded such cases to the Judicial Tenure Commission for reconsideration. The tenure commission has, in those instances, generally refused to increase the recommended discipline and generally no further action has been taken by this Court with the result that no discipline, even private censure, was imposed.

ture's intent in setting a high priority for adoption cases and parental rights cases; I've been on the Probate bench for 14 years and have watched this legislation evolve.

I appreciate the confidence you express in my ability evidenced by your statement that you know that I can resolve this matter quickly.

However, the reasons for the delays and problems in these adoption cases is something I did not cause or create, and the solution is no longer under my authority or control.

My attempts to resolve the problem by following the established and proper chain of command (an issue, you'll recall, that was very prominent and the topic of much arguing and discussion at our numerous meetings) have been futile, as I will explain later.

The delays are not because of my scheduling or the management of my docket as your letter implies. Hearing dates on almost all cases are usually set within fourteen days from the date I receive the case except in certain matters such as trials in will contests, where the attorneys need more time to complete discovery and other pretrial procedures. You'll find that trials, contested hearings, and other cases proceed faster on my docket than on most other judges' dockets throughout the state (although I never hear about that).

People who have cases assigned to me are entitled, at the very least, to expect that the Court can and will hear their case on the date and time scheduled. They shouldn't (and aren't) going to have to come to my courtroom for a hearing and be told that their case wasn't prepared properly due to the laziness and/or ineptitude of a Court employee, and that they'll just have to come back another day when the employee gets it right.

Many of these people take time off work to come to Court, and most are anxious and apprehensive about the procedure. I'm not about to increase that anxiety and apprehension by adding more

frustration to their situation by making them keep returning to Court because their case wasn't properly prepared.

You're correct in stating that there has been a dramatic change in the processing of adoption cases, although it dates back farther than the six months you mention in your letter. Actually, it dates back to shortly after my secretary left.

My secretary used to prepare all the adoption cases assigned to me; she talked with the parties involved, explained the procedure to them, prepared and insured that the proper notices were given, made sure that the case was ready for hearing and that all the provisions of the Adoption Code had been complied with, and then scheduled the case on my docket (usually within 14 days).

Much of the work that she did was actually the responsibility of the Adoption Supervisor, Irene Leonard.

Once my secretary left, it quickly became apparent that the Adoption Supervisor had little knowledge of the legal procedure required in these cases.

Cases were set for hearing and at the time of the hearing, (when and if the parties appeared) the hearing could not be completed because the case wasn't properly prepared. I repeatedly advised the Monroe Probate Court Administrator of the problem, and on occasion of his absence, advised the Assistant Administrator of the problem—specifically, that Mrs. Leonard doesn't know what she's doing.

I've experienced occasions where hearings have been set, the case was called at exactly the time and date set, and nobody shows up. Examination of the file shows no notice to anyone,—and no investigation. The Adoption Supervisor hasn't talked with the parties she was supposed to contact.

I recall one instance where nobody showed up, and I inquired as to where the parties were, and was

told by the Adoption Supervisor "Well, I was told the people would show up." No one did, as they probably had no idea the hearing was taking place, since the Adoption Supervisor relied on the adverse party to notify the other side of the hearing. That usually doesn't work.

In other instances, notices haven't been received because the addresses weren't correct (the result of carelessness, not wrong information being given to the Court.)

In another instance, the father whose parental rights were being permanently terminated did not appear at the termination hearing. I asked Mrs. Leonard if he had been served with notice. She replied that he had. I checked the file—he had not. The hearing was stopped, and the people sent home.

This case is particularly illustrative of the problem. It took me two telephone calls—a total of one minute, 40 seconds—to find out exactly where the father was and how to get him served. It wasn't as if he was dodging service—he can't. He was in Jackson prison, and had been for two years.

Initially, that particular situation might not appear unusual. And maybe in Wayne, Oakland, or Macomb county it wouldn't be because of the number of people they deal with and their volume of cases.

However, this is a small county. The father I described above was one of our more notorious and long term, repeat visitors to our Court before he got into the adult [system], and was a long term resident of our Youth Center. He was also on probation for a long time. Prior to her present job, our adoption supervisor was employed at the Youth Center and then as a Probation Officer for the Court.

To locate this person, I only had to ask another Probation Officer, make two brief phone calls (the first was to the probation officer), and I was able to locate him in less than two minutes.

Shortly after my secretary left, I advised the Monroe County Probate Court Administrator of the problem. Mrs. Leonard was also sending simple, routine matters through, and where she was supposed to make a recommendation, she would write "I recommend that this matter be reviewed by the Court."

One of these cases involved a simple request for release of adoption information. Mrs. Leonard had no idea what to do; she was totally unaware that she needed to check to see if releases had been filed so that the information could be given out. The Administrator advised me that when he talked with her about this, her reply was "The Court should have to do this—not me."

After my secretary left, Mrs. Leonard was incessantly asking what she should do in adoption cases, even the most routine matters. I initially advised her of some basic procedures, but when this continued, I advised the Monroe County Probate Court Administrator that it was apparent she didn't know what she was doing, and that she was constantly running to me instead of going to her supervisor. (Which was exactly what we had all agreed upon as the proper chain of command).

(I don't have any problem occasionally advising a Court staff member about procedural issues on an unusual case, but you'll recall I came under severe criticism at our meetings when it was perceived that I was allowing employees to skirt the chain of command).

I repeatedly told the Administrator, Mr. Pace, of the problem, and finally, Mrs. Leonard stopped the incessant inquiries. I asked Mr. Pace how he handled it, and he replied "I took care of it—she doesn't bother you anymore, does she?"

Perhaps, in addition to utilizing Mr. Pace to funnel complaints about my adoption cases to the Region I SCAO office, you might want to ascertain from him just exactly what he did to "take care" of the problem. I'd be interested in knowing myself.

You also should be made aware that when these problems with Mrs. Leonard continued, I wrote the Administrator a memorandum (on June 29th), asking what specific training she had to do this job. I also asked for an evaluation of the position.

I never have received a written reply to my requests, but I was verbally advised by Mr. Pace that the position would be evaluated "when everybody else's was," and as to the specific training, his reply was "I guess she's got some degree in cooking."

More serious events have occurred.

I was contacted by an individual who is fairly prominent in the community about an adoption confirmation. He stated that the adoptive mother (who he periodically works with) came in one day very upset and distraught. She had been unable to get information regarding her child's pending adoption from Mrs. Leonard, and had stopped in my office to ask that the case be set on a day when the adoptive father could be present.

She also stated that if she were given several weeks notice, she could know when her husband could be present. I was on the bench when she stopped, and didn't speak to her at the time.

Before I had a chance to speak with her, she told the Adoption Supervisor that she had stopped in to see me, and the purpose of her visit.

It was reported to me that at that point, the Adoption Supervisor told her that she had severely diminished the chances of the adoption being confirmed, and essentially, "If you went and bothered the Judge about this and pissed him off, you'll probably never get the kid." She reportedly attributed this to the fact that "The Judge is mean and vindictive."

The mother was given assurances by her co-worker that this wasn't true, and he advised her that he knew me and suggested that she call me directly. She did.

After a brief initial conversation, I learned that she had had problems with a previous adoption with another judge, and that she was only trying to make sure that her husband (the adoptive father) could be there for the hearing.

I explained that I would never set a hearing at a time when both the adoptive parents couldn't be present, apologized for the difficulties she had encountered with our employee, and we were able to set a hearing six or seven days later. For whatever it's worth, I got a thank you letter shortly afterward.

I advised the Court Administrator of what happened, and he essentially avoided the issue.

I've also received reports that Mrs. Leonard has asked the temporary secretary in my office for advice on adoptions (she knows less about adoption procedure than does Mrs. Leonard).

I've repeatedly advised the Court Administrator about the problems with Mrs. Leonard's lack of procedural knowledge. She is an emotional individual who files grievances or complaints when the Administrator has asked her to do her job and the work which is her responsibility.

I've also heard numerous complaints from her co-workers that she spends much of her time in her office knitting or reading the Bible (a fact that I've personally observed when I've dropped by her office unexpectedly).

I'm not about to criticize someone for reading the Bible, but I do think it would help alleviate the problem if she were to intersperse her scripture reading with a few passages from the Adoption Code. We do employ her as the [Adoption] Supervisor, not our spiritual leader.

Cases have not been properly prepared, informa-

tion in the files is not complete, notices are sent to the wrong addresses, if at all, and the parties are not briefed about the procedure and what information they'll have to bring to the hearing.

I don't believe its asking too much to expect a court employee to have some semblance of basic competence and a working knowledge of the court procedures which is part and parcel of her job.

I'm returning all the pending adoption files to the Court Administrator. I would suggest that he review each of the cases, and make sure that in each case, the file is complete and ready for hearing, the Adoption Supervisor had completed a proper investigation and spoken to all the parties involved, that she has advised the parties of what information they will have to have at the hearing, and that the proper notices have been given to the parties (at the right addresses).

When I receive a certification from him that this has been done, the cases will be set within fourteen days.

Also, I'd appreciate it if you could take a minute and ask Herb Levitt to direct Mario to get our computer fixed. Repeated requests and advisements to his office have been futile, and I have to type my correspondence on my personal equipment at home. Considering my typing skills, this takes a substantial amount of time.

Thank you.

Very truly yours,

James McCauley Seitz
Probate Judge

cc: Herb Levitt

APPENDIX B

PARTIAL HISTORY OF DISCIPLINE FROM
JUDICIAL TENURE COMMISSION REPORTS:

*Matter of Hague,* 412 Mich 532 (1982). A Detroit
Recorder's Court, Traffic and Ordinance Division,
Judge was *suspended* from office for *sixty days*
without pay for misconduct in office and conduct
clearly prejudicial to the administration of justice.
He was charged with disobeying valid orders en-
tered by superior courts; refusing to follow deci-
sions of higher courts; *abusing his contempt pow-
ers;* and improperly *excluding attorneys from prac-
ticing in his courtroom.* The Court held that the
charges against him were clearly established. It
also noted that *Respondent's war with local pros-
ecutors over the enforcement of non-traffic ordi-
nances led him to ignore the limits of his judicial
authority and the obligations imposed upon his
office.* [Emphasis added.]

*Matter of Frankel,* 414 Mich 1109 (1982). A
District Court Judge agreed to *public censure* as
recommended by the Commission as a result of his
conduct, which included the *use of vulgar lan-
guage toward an attorney in court proceedings.*
[Emphasis added.]

*Matter of Lawrence,* 417 Mich [248] (1983). A
District Court Judge was *suspended* from office for
*nine months* without salary, publicly censured,
and ordered to return unused campaign contribu-
tions to contributors or remit $5,667.97 to the
State Bar Client Security Fund. The Respondent
was charged with improperly using his office in
*assigning indigent criminal cases to and allowing*
appearances by attorneys with whom he had finan-
cial ties; maintaining an interest in a Michigan
liquor license; *accepting free legal services* from
and simultaneously assigning criminal cases to an
attorney; improperly using his office and misrepre-
senting material facts to the County Gun Board in
order to influence the issuance of a concealed
weapon's permit to an acquaintance; improper

involvement with certain for-profit corporations; and impropriety related to his reporting and retention of campaign funds. [Emphasis added.]

*In the Matter of Binkowski,* 420 Mich 97 (1984). A District Court Judge was *publicly censured* for his admitted act of proffering to others *only a part of an admonitory letter* sent to him by the Commission. The circulation of the edited letter conveyed the false and misleading impression that certain grievances had been dismissed by the Commission without any finding of impropriety on the part of the Respondent.

The *Court accepted* the conclusion of the Commission that Respondent's actions were *dishonest.* [Emphasis added.]

*In the Matter of Tschirhart,* 420 Mich 1201 (1984). A District Court Judge was *publicly censured* for abusing his judicial office by *displaying favoritism and permitting family relationships to influence his judgment.*[59] [Emphasis added.]

*In the Matter of Sobotka,* 421 Mich 1201 (1985). A District Court Judge was charged with appearing *intoxicated both on the bench and at a public function and her excessive use of alcohol was alleged to have resulted in her inability to render timely decisions* in cases awaiting her determination.

Prior to the close of the public hearing Respondent stipulated to the facts presented by the Commission and *consented* to its recommendation.

The Supreme Court adopted in full the Commission's recommendation and ordered *her censure,* and suspension *for two months* to be *followed by six months supervision* by the Commission. [Emphasis added.]

*In re Bayles,* 427 Mich 1201 (1986). A District

---

[59] The commission's recommendation was of a sixty-day suspension without pay given that Respondent was defeated in his bid for reelection as district judge.

Court Judge was *publicly censured* for his *failure or refusal to timely file a state income tax return* for the years 1979 through 1984, or to timely file a *city tax return* for the years 1976 through 1984, and for the fact that 12 *misdemeanor warrants* for income tax fraud and evasion had been issued against him due to his failure to file the city tax returns. [Emphasis added.]

*In the Matter of Merritt,* 431 Mich 1211 (1988). A district court Judge was *publicly censured* for *improperly using fines collected from attorneys for late filings,* tardy appearances and failure to appear, *in order to augment a charitable fund* to assist indigent drug and alcohol abusers appearing before him. The conduct of the Judge gave the appearance that he used his judicial office to solicit monies from attorneys. [Emphasis added.]

*In re Templin,* 432 Mich 1220 (1989). A Circuit Court Judge was *publicly censured for dating a criminal defendant while her case was pending before him.* The conduct of the judge constituted an appearance of favored treatment, an appearance that improper *ex parte* communication may have taken place, and failure to avoid behavior which erodes confidence in the judiciary. [Emphasis added.]

*In re Waterman,* 433 Mich 1207 (1989). This District Court Judge was found guilty of misconduct as a practicing attorney by his *failure to act diligently and promptly, neglecting of legal matters entrusted to him, failure to deposit client funds in a trust account and commingling and misappropriating client funds.*
The Judge consented to the recommendation of the Commission which was adopted by the Supreme Court in its order of *public censure.* [Emphasis added.]

*In re Griffin,* 400 NW2d 595 [Mich, 1987]; 448 NW2d 352 [Mich, 1989]; 454 NW2d 116 [Mich,

1990]. A District Court Judge was charged with improper courtroom conduct directed at litigants and lawyers and *gross abuse of his contempt authority.* In his Answer to the Complaint, he did not contest the allegations and claimed his behavior resulted from an emotional disorder for which he was being treated. Following his interim suspension, he consented to the Commission's recommendation of continuing treatment and supervised reinstatement with *extensive monitoring* of his courtroom. [Emphasis added.]

SAMPLING OF ADMONITIONS ISSUED
January-December, 1991.

Respondents were admonished for

. . . failing to exercise restraint in dealing with a defendant and his attorney, *vindictively raising the defendant's bond,* and *manifesting personal animus against* defendant's counsel. An attorney cannot be held in contempt mainly for asserting the interest of his client.

. . . making *inappropriate and potentially offensive comments in the courtroom* which are subject to misinterpretation by others.

. . . publicly *condemning someone for his sexual preference,* thereby exhibiting prejudice against an entire segment of society.

. . . *improperly appointing attorneys,* who had financial dealings with the judge, *as successor receivers* in a civil case, giving rise to the appearance of favoritism and economic self interest.

. . . failing to act affirmatively to preserve the assets of a ward of the court, allowing a conservatorship to continue which *drained a meager estate of its assets* despite repeated challenges by the ward, supporting his decisions with inconsistent rulings, and failing to dispose of the case in the manner set forth by the Court of Appeals. Public confidence in the judiciary is jeopardized by even the appearance of a judge *defying the authority of a higher court.*

\* \* \*

*. . . allowing many cases to remain under advisement for an unduly long time,* contrary to Canon 3A(5) of the Code of Judicial Conduct which requires a judge to "dispose promptly" of the business of the court.

. . . failing to disclose to parties that their opponents in litigation were represented by members of a law firm *contemporaneously representing the judge* and his wife in unrelated legal matters. [Emphasis added.]